Lawanna EDGECOMB, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 46S00–9412–CR–1308.

Supreme Court of Indiana.

Nov. 1, 1996.

Rehearing Denied Jan. 22, 1997.

Donald W. Pagos, Michigan City, for Appellant.

Pamela Carter, Attorney General of Indiana and James A. Joven, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

A jury found appellant Lawanna D. Edgecomb guilty of aiding Laurida Arion in the April 12, 1994, felony murder of Anna Motylewski.[1] The trial court sentenced Edgecomb to the forty-year presumptive sentence plus an additional twenty years more for aggravating circumstances.

Edgecomb raises a substantial issue on direct appeal concerning sufficiency of the evidence. Upon careful examination, we resolve it against her. Her other allegations of error likewise do not point to reversal. Accordingly, we affirm.

## I. Facts

The facts most favorable to the verdict are that sometime on or before Sunday, April 10, 1994, Lawanna Edgecomb told Laurida Arion, the sister of Edgecomb's boyfriend, how she stole money from Anna Motylewski in December 1993. While visiting Anna Motylewski's to use the phone, Edgecomb had stolen about $150 from a box in Motylewski's bedroom closet when the ninety-two year old woman was not looking. Soon after, Motylewski confronted Edgecomb at Edgecomb's home about the missing money. Edgecomb denied taking it. Although Motylewski told Edgecomb never to visit her again, the elderly woman did not report the incident to the police.

When Arion learned of this easy theft, she showed great interest in trying to take more money from Motylewski. The two women discussed Motylewski and her money that Sunday afternoon in Edgecomb's kitchen. Arion's nineteen year old son Christopher Griffin was also at Edgecomb's, and he overheard part of the conversation. Arion spent that night at Edgecomb's, and the two further discussed Edgecomb's theft late that night in the privacy of Edgecomb's bathroom while the others in the house slept.

On Monday, April 11, Edgecomb provided Arion with information about the elderly woman's money, whether she had any more, where exactly it was kept, the layout of her house, and her daily routine regarding visitors and nurses, etc. Arion asked Edgecomb to help her gain entrance to Motylewski's home by asking to use the phone, so that Arion could use the opportunity to search for money in the house. Edgecomb refused, stating that Motylewski would no longer allow her to use the phone because of the previous theft.

On Tuesday, April 12, Arion again visited Edgecomb's, arriving around 10 a.m. Arion stood at the window and watched Motylewski's residence with a pair of binoculars while Edgecomb told her more about Motylewski's house, including whether there was a basement or an attic. Arion asked whether Motylewski's basement had a door leading to it, and whether Motylewski kept it open or shut. She also made statements to Edgecomb about the difficulty Motylewski must have in getting up and down the basement stairs. From this conversation Edgecomb understood Arion to be considering pushing Motylewski down the stairs to make it look like an

---

1. Ind.Code Ann. § 35–42–1–1(2) (West Supp. 1996) ("person who ... kills another human being while committing or attempting to commit ... robbery ... commits murder, a felony"); Ind.Code Ann. § 35–41–2–4 (West 1986) ("person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense....").

accident if something went wrong. Arion again asked Edgecomb to accompany her to Motylewski's, and offered to split any money she was able to find with Edgecomb. Again Edgecomb refused, stating that Motylewski would never let Edgecomb in to use the phone.

Edgecomb then left her home to call her doctor for an appointment from the residence of Verna Bailey, two doors down. She reached the doctor's answering machine which said to call back after 1 p.m. She chatted awhile with Bailey, then went back home. Arion was still there. At around 1 p.m. Edgecomb watched Arion go out to her car and stay there while watching Motylewski working in her yard. When Motylewski went back inside her home, Arion proceeded across the street and up onto her porch. Arion knocked on Motylewski's door, and told the elderly woman that she was the sister of a neighbor and needed to use her phone. Arion pointed to her red Ford Escort parked in Edgecomb's driveway across the street as verification. Motylewski knew that the Propes/Edgecomb residence did not have a phone, so she allowed Arion into her home.

Shortly thereafter, Christopher Griffin arrived at Edgecomb's. He knocked on the door, but Edgecomb would not answer. In fact, she went into her bathroom so Griffin would not see her, hoping he would go away. He persisted in his knocking, thinking his mother must be there because her car was parked in front of the house.

Edgecomb finally let him in. When Griffin asked Edgecomb where his mother was, she informed him that Arion had gone to Motylewski's to try to sneak some money out of her house, and that Arion had offered to share any money she got with Edgecomb. Edgecomb soon asked Griffin to go over to Motylewski's with her to see what was going on, but Griffin would not go. Edgecomb walked over to Motylewski's by herself, going up onto the porch. She heard noises that sounded like shuffling or someone going through things. Upon peering through the storm door, she saw Motylewski at the bottom of her basement stairs, with Arion standing behind her demanding to know where her

money was. She returned to her home about five minutes after she left, telling Griffin that she thought something was going wrong and asking him to return to Motylewski's with her. When Griffin again refused, Edgecomb went to Bailey's again to call her doctor, as well as to call Motylewski's to see what was going on.

The evidence concerning what occurred inside Motylewski's home suggests that after Arion finished using the phone, she asked Motylewski for her money and where it was located. When Motylewski replied that she did not have any, Arion forced Motylewski into the basement and began to beat her severely while continuing to demand money. (This is the scene Edgecomb observed by peering through the porch door.) After the beating, Arion went back upstairs and found some money, papers, and a telephone. She then fled the house.

Arion ran back across the street to Edgecomb's. She found Griffin there alone (by this time, Edgecomb had gone a second time to Bailey's to call the doctor and Motylewski's). Arion was carrying a bag in her arms; she asked Griffin to tell Edgecomb that she needed to meet her at Arion's parent's home in LaPorte later that day. Meanwhile, the battered Motylewski slowly made her way up the stairs and eventually out into the yard to seek help.

After making her doctor's appointment and then receiving no answer at Motylewski's, Edgecomb left Bailey's at around 1:20 p.m. and returned home. As she passed Motylewski's, Edgecomb noticed the elderly woman in her front yard calling to her for help. Edgecomb assisted her back to her front steps and helped her sit down. Motylewski was bleeding severely from her eyes and from abrasions on her arms and head. Her face, neck, chest, and back were severely bruised. When asked what had happened, Motylewski told Edgecomb that a woman claiming to be Edgecomb's sister had asked to use her phone, and then had beaten her after demanding money and not getting any. After seating the woman, Edgecomb ran across the street to her home and procured the assistance of Griffin—Arion was already gone. The two helped Motylewski back into

her kitchen and got bandages and towels for her wounds. Not finding Motylewski's phone, Edgecomb went across the street to another neighbor's home and called 9-1-1.

At 1:53 p.m., Kim Ritter, dispatcher for the LaPorte County 9-1-1 center, received the call from Edgecomb, who said: "Now, a neighbor lady across from me, I was walking back from another neighbor's ... and she's all bloody, like she has fallen or something, I don't know what's happened to her. She can't, I can't make out what she's saying." (R. at 211.) Edgecomb also told Ritter that Motylewski had mentioned a "red car." The dispatcher asked Edgecomb, "So you don't know if someone may have assaulted her or anything," to which Edgecomb replied, "She said, I don't know why they did this? I said, Ann, who did this? ... She said I don't know." (R. at 211–12.)

When the first police officer arrived a few moments later, Edgecomb approached him, identified herself as the 9–1–1 caller, and described how she had encountered and assisted Anna while returning from a neighbor's. Edgecomb also reported that earlier she had observed a white vehicle driven by a female who had gone to Anna's door, but she could not describe the woman or say if the woman had gone inside. After taking a statement from Motylewski, the officer returned to Edgecomb and asked her if she had any sisters or relatives who might have gone to Motylewski's that day. Edgecomb reported that she only had one sister who lived in LaPorte and had not seen her for two months, and that none of her relatives would have had any business at Motylewski's that day.

Upon investigation the police discovered blood on the last few steps of the basement, a great deal of blood on the floor at the base of the stairs, and blood and hair on a ceiling support column. They also found a broken styrofoam flower pot, a pop can that had been thrown against a wall and exploded, and scattered cat food cans, some dented with blood on them. A ladder had also been turned over. By contrast, the upstairs appeared relatively normal, except for the placement of a chair, which appeared to have

blood drops on it, in front of an open bedroom closet.

When Christopher Griffin returned to his grandparent's house (where he lived) after Motylewski was taken to the hospital, he found there his mother, Laurida Arion. Arion told Griffin she had stolen $200 from Motylewski, and asked Griffin what she should do with the other items she had taken, such as the telephone and some papers. Griffin told her to get all of those things out of the house, that he did not want to have anything to do with the . crime. She left shortly thereafter.

Later that afternoon Edgecomb visited Verna Bailey's a third time. She tearfully told Bailey that Arion had killed Motylewski.

That evening the police decided to question Edgecomb as a principal witness. They asked her to accompany them to the police station to make a formal statement, and she voluntarily complied. Edgecomb gave her name as "Lawanna King" (her former married name), and told the police she went to Verna Bailey's home around 1 p.m. to use the phone, and upon returning had found Motylewski calling to her for help. Edgecomb did not mention Arion or anything that transpired between them before Edgecomb found Motylewski after the beating. Edgecomb repeated her story about a white car arriving earlier that day at Motylewski's and squealing its tires as it left, as well as the victim's statements about a woman in a red car claiming to be Edgecomb's sister. Edgecomb also told police that Christopher Griffin was the only person who visited her home that day. The police asked Edgecomb why she had not gone to use Motylewski's phone, which was closer, instead of Bailey's. Edgecomb explained that the two had had a misunderstanding over *fifteen dollars* Motylewski could not find after Edgecomb used her phone a few months earlier.

The next morning, Wednesday, April 13, the police questioned neighbors about the incident and learned that a woman who drove a red Ford car had spent much of Tuesday morning at Edgecomb's house. Remembering Edgecomb's statement that Griffin was the only person at her home that day, the police again visited Edgecomb and asked her

to repeat what had happened. Edgecomb basically gave them the same story as the night before, that the only person who had been in the house with her that day was Griffin. The police said they would like to speak to Griffin, so Edgecomb called Griffin to ask him to take her and her daughter to the dentist's office that afternoon and to let him know that the police wanted to speak to him at her home. When Griffin arrived, Edgecomb told him the police had already spoken to her the day before and did not know that his mother had been involved. Griffin took this to mean he should not let the police know of his mother's involvement, either. Griffin spoke to the police, saying he had not seen his mother at Edgecomb's the previous day and did not know of her involvement in any robbery or beating of Motylewski. The police asked Edgecomb if she would come downtown that afternoon to make another formal statement, and she agreed to come after taking her daughter to the dentist.

The police left Edgecomb's residence. Griffin drove Edgecomb to a convenience store where she bought some groceries and called Arion to arrange to meet her at a downtown McDonald's. Griffin took Edgecomb to the McDonald's on the way to the dentist, but when Edgecomb arrived Arion was not there. During this drive Griffin informed Edgecomb that his mother had only gotten $200 from Motylewski. After the dental appointment, Edgecomb went to the police station for her second formal interview.

At that afternoon's interview, the police officers advised Edgecomb of her *Miranda* rights and asked her to sign a form waiving her rights, because they suspected Edgecomb was not telling them the whole truth. She signed the form as "Lawanna D. Edgecomb" (her maiden name which she resumed using after her divorce) and again stated that no one else had been at her residence and that she had no idea what had happened in Motylewski's home. The police then informed Edgecomb that they knew from statements made by her neighbors that another female had been at her home on Tuesday, and that a small red Ford automobile

had been parked outside her home that day. Caught in an obvious lie, Edgecomb basically recounted the entire scenario, including her theft of money from Motylewski in December and Arion's interest in Motylewski after finding out about it. She did not tell the police, however, that she had gone over to Motylewski's before going to Verna Bailey's a second time that day, nor did she tell the police she had suspected Arion would use force if "things went wrong." When finally asked if she had anything further to say, Edgecomb replied, "All, I know is that Laurida went over to the house, ahm, I did not go to the house, I do not know where any of the occasions actually took place. Ahm, I do know that Laurida was the only person that was there." (R. at 464, Tr. at 28 (capitalization removed).)

That afternoon, Wednesday, April 13, Anna Motylewski died in the hospital from complications brought on by the injuries suffered during the beating.

The next day, Thursday, April 14, the police formally questioned Griffin. He revealed some information Edgecomb had omitted in her second formal statement, including her trip to Motylewski's house to see what was going on, and her request that he return to Motylewski's with her because of what she had observed and heard. Griffin also revealed that, while Edgecomb was at Bailey's, Arion had returned to Edgecomb's from Motylewski's with a bag in her arms, and that Arion asked him to tell Edgecomb she needed to meet with her at the LaPorte home of Arion's parents.

Because of these final pieces of evidence disclosed by Griffin, the police asked Edgecomb to make another formal statement at the jail on Friday, April 15. At this third interview she signed a waiver of rights form, again as "Lawanna Edgecomb." Edgecomb again recounted the story of the days leading up to the 12th and Arion's interest in Motylewski's house and money. Edgecomb also disclosed that she had in fact gone to Motylewski's after Griffin had arrived to see what was happening. Her testimony about this event was conflicting. At one point she stated that she "heard ... talking [and] felt everything was all right." (R. at 482, Tr. at

38.) Shortly thereafter, however, this exchange occurred:

> Edgecomb: I ran back [to my home]....
> I told [Christopher] there are noises
> over there, ahm, I don't know if it
> sounds like fighting noises or if it's
> banging from someone going through
> things, I said, I think we should go over
> there.
>
> Officer: Were you scared?
>
> Edgecomb: Yes, I was.

(*Id.*)

Edgecomb was also asked if her going to Bailey's the second time was really planned so as to provide Edgecomb an alibi while Arion committed the crime. To this Edgecomb replied: "No, sir, but [Arion] did make mention that day [that] I had nothing to worry about, because I had to go to [Bailey's] house and what I didn't see, I would [know] nothing about." (R. at 482, Tr. at 40.) Finally, she stated that she "would never have guessed that [Arion] would have gotten violent with the woman." (R. at 482, Tr. at 21.)

Ten days later, the police again asked Edgecomb to come down to the station and make a fourth formal statement. She again signed a waiver of rights form, this time as "Lawanna King." At this interview she repeated the same story as before, but this time she disclosed that she had suspected Arion might try to push Motylewski down the stairs if something went wrong, to kill Motylewski and make her death look like an accident.

Testifying at trial, Edgecomb offered a story quite unlike all of her recorded statements to the police. She attempted to tell the story as if she were completely innocent and had no idea what Arion intended to do when Arion left for Motylewski's. For instance, Edgecomb testified that when Arion first asked her questions about Motylewski, she thought Arion's inquiries were based on

an interest in becoming a live-in care-provider, as Arion needed a job and place to live.

Edgecomb also testified she really did not suspect anything was happening at Motylewski's when Arion was there. She stated that she kept asking Griffin to accompany her over there, not because she thought something was going wrong, but because Griffin had come to Edgecomb's with a message for Arion and that she did not want to act as his "message service" by going over there alone. She also stated that when she had gone to Motylewski's, she heard voices and assumed that everything was ok, and had proceeded to Verna Bailey's the second time, not (as she had said to the police) to call to see if something was wrong, but merely to inform Arion that her son was at her home and had a message for her. When asked why she did not just knock on Motylewski's door and give the message to Arion, she said it was because she is not a "forward" person and did not feel comfortable about such an intrusion. She testified that as far as she knew, Arion had gone to Motylewski's to use the phone and that she merely suspected that Arion might try to sneak some money out as she had done three months earlier.

## II. Sufficiency of the Evidence

Appellant argues that the evidence is insufficient to establish that she aided Arion in robbing Motylewski, and, therefore, she cannot be held liable as an accomplice for a murder which arose out of that robbery.[2]

■ The standard of review for a sufficiency of the evidence issue is straightforward:

> [T]his Court neither weighs the evidence
> nor judges the credibility of witnesses.
> Rather, we consider only that evidence
> most favorable to the State and all reasonable inferences to be drawn therefrom. If
> there is substantial evidence of probative
> value which would permit a reasonable trier of fact to find the existence of each

**2.** Appellant breaks this argument into two parts: The evidence was insufficient to show that she aided Arion in the commission of anything, or the evidence was insufficient to show that she aided Arion in the commission of a robbery, as opposed to a theft. Because we find the evidence warrants a finding that Edgecomb aided .

Arion in the commission of a robbery, we do not need to reach Edgecomb's other argument, namely whether an accomplice who aids in the commission of a theft can be guilty of felony murder when the perpetrator instead commits robbery and murder.

element of the offense beyond a reasonable doubt, then the judgment must be affirmed.

*Johnson v. State,* 490 N.E.2d 333, 334 (Ind. 1986).

■ The Indiana Code provides that "[a] person who knowingly or intentionally aides, induces, or causes another person to commit an offense commits that offense...." Ind. Code Ann. § 35–41–2–4 (West 1986). We have interpreted this accomplice liability statute to hold "an accomplice ... criminally liable for the acts done by his confederates which were a probable and natural consequence of their common plan, even though the acts may not have been originally intended as part of their plan." *Johnson,* 490 N.E.2d at 334. Factors we consider in determining whether a defendant aided another in the commission of a crime include: "(1) presence at the scene of the crime, (2) companionship with another engaged in a crime, (3) failure to oppose the commission of the crime, and (4) the course of conduct before, during, and after the occurrence of the crime." [3] *Id.* When we review the facts in this case, we conclude that a reasonable trier of fact could find that Edgecomb aided Arion in robbing Motylewski.

■ First, Edgecomb's actions *before* the commission of the crime suggest guilt. Edgecomb had already successfully stolen about $150 from Motylewski. Griffin overheard his mother and Edgecomb discussing Motylewski's money and its location on the afternoon of April 10, and Edgecomb admits the two women discussed the same topic again late that night in the private confines of Edgecomb's bathroom. Over the course of the next two days leading up to the crime, Edgecomb provided Arion with more information about the location of Motylewski's money, the layout of the house, Motylewski's daily routine and habits, and a venue from which to observe the victim with binoculars and formulate the plan. Edgecomb also admitted she knew Arion intended to steal money from

Motylewski, and that Arion might very well push the victim down the basement stairs to accomplish that task. From this evidence a reasonable juror could conclude either that Edgecomb did much more than innocently and naively answer questions about Motylewski without knowing what Arion was planning to do, or that Edgecomb did more than help Arion develop a plan to "sneak" money out of Motylewski's home when she was not looking. "Sneaking" does not entail pushing someone down the stairs if something goes wrong, which Edgecomb admitted she knew was a distinct possibility.

Second, Edgecomb's actions *during* the commission of the crime point toward guilt. Edgecomb would not let Griffin in her home after Arion had gone to Motylewski's, going so far as to hide in the bathroom so Griffin would not see her. Also, Edgecomb went to the scene of the crime and saw enough to conclude that Arion was in fact using fear or force to rob Motylewski and yet she neither intervened nor called the police. Edgecomb also told Griffin that his mother might give her part of the loot. Finally, Edgecomb went down to a neighbor's while the crime was being committed to attempt to call Motylewski (a number which she "knew by heart," though she did not have a phone of her own from which to have called Motylewski regularly). She told police and Griffin she did so because she was worried something was going wrong at Motylewski's and wanted to make sure everything was all right. At trial, however, she testified that she called Motylewski simply to give Arion the message which Griffin had come to convey. This inconsistent testimony lends credence to the prosecutor's theory that Edgecomb was a lookout and made the call to let Arion know Griffin had come to her house.

■ Third, Edgecomb's actions *after* the commission of the crime point toward guilt. Edgecomb tried to conceal Arion's involvement in her reports to both the 9–1–1 dis-

---

**3.** While the factors listed here summarize many of those considered in previous cases addressing this issue, this list is not exhaustive. As the Court of Appeals has noted, "The facts and circumstances of each case must be reviewed to determine whether a person participated in the

commission of an offense as an accomplice, for, as Justice Hunter observed, there are no 'hard and fast rules in this area of the law.' " *Byrer v. State,* 423 N.E.2d 704, 706 (Ind.Ct.App.1981) (quoting *Pace v. State,* 248 Ind. 146, 149, 224 N.E.2d 312, 314 (1967)).

patcher and the police, and she indicated to Griffin that he should do the same. She tried to set up a meeting with Arion after the commission of the crime. Finally, and probably most detrimental to Edgecomb's defense, she told a markedly different story at trial about what she knew and why she did what she did than she told the police three times previously. This made her testimony seem incredible. The only evidence favoring Edgecomb was in her statements to the police and her testimony on the witness stand. We are unable to say that a reasonable juror, after listening to Edgecomb's inconsistent statements and obvious falsehoods, could not choose to disbelieve all of the exculpatory evidence in Edgecomb's own various statements about her knowledge and motivations. A reasonable juror could conclude that by lying during the investigatory process, the trial process, or both, Edgecomb was attempting to conceal her own guilt. The jury is not required to believe every part of a defendant's testimony. *Marshall v. State*, 621 N.E.2d 308 (Ind.1993).

Considering Edgecomb's admitted presence at the scene, her companionship and conversations with Arion from Sunday through Tuesday, her failure to try to stop Arion or call the police once she was aware that something was going wrong, and her course of conduct before, during, and after the commission of the crime, we hold that a reasonable jury could conclude beyond a reasonable doubt that Edgecomb was a "behind the scenes" planner and participant in this robbery. When taken in the light most favorable to the verdict, the evidence supports the conclusion that Edgecomb knowingly aided Arion in robbing Anna Motylewski. Because Arion murdered Motylewski while committing the robbery which Edgecomb aided, Edgecomb is also criminally liable for Motylewski's death.[4] *See, e.g., Ford v. State*, 521 N.E.2d 1309 (Ind.1988); *Collier v. State*, 470 N.E.2d 1340 (Ind.1984); *Fisher v. State*, 468 N.E.2d 1365 (Ind.1984).

### III. Use of Alias as Prejudicial Error

■ Edgecomb next asserts that reference to her as "Lawanna Edgecomb a/k/a Lawanna King" in the charging information and jury instructions was error, calling such use of an alias "improper," "prejudicial," and "untrue." (R. at 140.) The trial court overruled an objection on this point.

Appellant cites cases from other jurisdictions to support her argument that the unnecessary use of an alias labels a defendant as part of the "criminal class" and renders her suspicious under the notion that "if a person must hide [her] true identity via an alias, [s]he must have something criminal to hide." (Br. at 18, (citing *People v. DeHerrera*, 680 P.2d 848 (Colo.1984)).) The Indiana Court of Appeals addressed a similar issue some twenty years ago in *Moore v. State*, 156 Ind.App. 687, 298 N.E.2d 17 (1973). It disapproved the unnecessary use of aliases and stated that it would not be "difficult to conceive a situation wherein the unnecessary, or excessive, or unproved use of aliases would create a connotation of criminality sufficient

---

4. When viewed in light of other Indiana cases upholding felony murder convictions for accomplices who did not actually commit the homicide, we find that this case, while pushing the outer limits of felony murder/accomplice liability jurisprudence, falls in line with their facts and holdings. *See, e.g., Zenthofer v. State*, 613 N.E.2d 31 (Ind.1993) (upholding felony murder conviction of defendant who accompanied perpetrator to a convenience store, where perpetrator shot clerk and threatened to kill defendant if he told anyone, because defendant: had overheard perpetrator speak earlier in the evening about robbing the store and committing murder, knew perpetrator had a handgun, lied to police about his presence at the scene, helped perpetrator hide the murder weapon, and provided the police with cigarettes which had been stolen from the store during the robbery); *Eads v. State*, 577 N.E.2d 584 (Ind.1991) (upholding felony murder conviction of defendant whose partner shot and killed the owner of the gas station which the two had intended to burglarize, even though neither had brought the rifle with them from their parked truck to the station and defendant was in field adjacent to station when partner shot and killed owner with rifle, the two having fled in separate directions (the defendant to the field and the partner to the truck) after the owner had seen them peering through a window and fired upon them). As in *Zenthofer*, Edgecomb's actions and untruths after the commission of the crime make suspect her contention she was not in any way involved in the crime. As in *Eads*, it does not matter if Edgecomb really did not expect Motylewski to be injured, since there was reasonable evidence establishing her involvement in the planning and commission of the robbery itself.

to thwart the fairness of the trial." *Moore,* 156 Ind.App. at 690, 298 N.E.2d at 18. We agree that such cases may exist; however, as in *Moore,* this case is not one of them.

Throughout the trial witnesses referred to appellant as both Lawanna King and Lawanna Edgecomb. Appellant's neighbor Geneva Slaydon, 9-1-1 dispatcher Kim Ritter, and Christopher Griffin, the nephew of appellant's boyfriend, referred to her at trial as "Lawanna King." (R. at 199, 219, 365.) Appellant introduced herself to Patrol Officer Richard Buell and neighbor Verna Bailey as "Lawanna King." (R. at 230, 254.) However, Detective Phillip Schott referred to her as "Lawanna Edgecomb," (R. at 449), and Detective Sergeant Arland Boyd referred to her as "Lawanna Edgecomb King," (R. at 474).

Appellant's status as a person of dual names is best illustrated by the way she referred to herself during various police interviews. On April 12 she said her name as "Lawanna King." (R. at 431). On April 13 she signed her name on two waiver of rights forms as "Lawanna Edgecomb." (R. at 455, 460.) On April 15 she again signed her name on waiver of rights forms as "Lawanna Edgecomb." (R. at 478, 480.) On April 25, however, she signed her waiver of rights form as "Lawanna King." (R. at 486.) One who provides the police with two different names over a period of two weeks and signs different documents to that effect has no straight-faced challenge to make concerning the notation and use of an alias by the State and the court. The use here of both names accurately reflected how appellant was known by herself and others and was reasonably necessary to avoid juror confusion.[5]

### IV. Declarations and Acts of Co-Conspirator as Evidence

■ During trial the prosecutor asked Christopher Griffin to testify concerning a conversation he overheard between Arion and Edgecomb on April 10. Edgecomb raised a hearsay objection to any testimony relating statements made by Arion during that conversation. The prosecutor replied

that Evidentiary Rule 801(D)(2) provides that statements made "by party opponents and ... by a co-conspirator or party in furtherance of a conspiracy" are not hearsay (R. at 361). Edgecomb contended that independent evidence of a conspiracy must be admitted before hearsay testimony of one conspirator's statements can be offered as evidence against another conspirator and that none had been offered. Edgecomb's objections were overruled. Griffin then testified that he heard *Edgecomb* say to Arion that she "knew the old lady had money and she knew its whereabouts." (R. at 367.)

Edgecomb's objection concerned only statements made *by Arion.* She is thus precluded on appeal from raising objections to the admission of statements made *by Edgecomb* during the conversation. *Brewer v. State,* 605 N.E.2d 181 (Ind.1993); *Jacobs v. Moffatt,* 3 Blakf. 395 (Ind.1834).

■ Edgecomb also objected to the introduction of photographs depicting Motylewski's injuries shortly after the beating occurred, claiming them to be irrelevant. Edgecomb further argues that these photos were inadmissible because they were evidence of the acts of a co-conspirator, and that no evidence of a conspiracy had been introduced at that point. Both arguments rest, and fail, on the issue of relevancy.

■ The admission of photographs is within the sound discretion of the trial court and the photographs are admissible if they depict an object or scene which a witness would be permitted to describe through testimony. *Hubbard v. State,* 514 N.E.2d 1263 (Ind.1987). These photographs were offered as visual proof of what had been established through the testimony of witnesses—that Anna Motylewski had suffered severe injuries. A recording of Edgecomb's 9-1-1 call had already been played in which Edgecomb described Motylewski's injuries, and police witnesses had also testified concerning them. Because the photographs tended to corroborate testimony that had already been

---

5. We also note that any prejudice accruing from the use of the alias could have been obviated by asking Edgecomb, Andre Propes, or even Christopher Griffin during any of their respective examinations why other witnesses referred to the appellant as both "King" and "Edgecomb." *See, e.g., Moore,* 156 Ind.App. at 689-90, 298 N.E.2d at 18.

introduced, we find them relevant and their admission to be within the trial court's discretion.

## V. Autopsy Photographs

 Edgecomb objects to the admission of photographs depicting the victim's body shortly before an autopsy was performed on it. Edgecomb argues that the jury had already seen photographs of Motylewski's injuries and had heard extensive testimony from two physicians regarding Motylewski's cause of death, so autopsy photographs at this juncture were more prejudicial to Edgecomb than probative of Motylewski's cause of death.[6]

[Autopsy] photographs are admissible if they provide relevant evidence and their relevance is not outweighed by their tendency to inflame and impassion the jury against the defendant. The question necessarily becomes one of balancing those concerns, and thus the trial court has broad discretion in determining whether such photographs should be admitted in a particular case.

*Richardson v. State,* 476 N.E.2d 497, 500 (Ind.1985). We review the admission of such photographs only for abuse of discretion. *Boyd v. State,* 494 N.E.2d 284 (Ind.1986).

 The twelve photographs at issue in this case consisted of eight pictures of the victim's head, including one of a laceration to the scalp with the gloved hand of the pathologist parting the hair and placing a ruler beside the wound, and four pictures of the victim's torso and arm. The pictures yielded a more clinical depiction of the victim's injuries than the first photographs taken at the hospital. The bandages covering parts of the body in the hospital photos were removed; moreover, the autopsy photos offered better evidence of the victim's bruises about her head and neck because dried blood evident in the earlier photos had been removed. Finally, and most importantly, these photographs were taken before the autopsy was per-

formed and did not demonstrate incisions or insertions resulting from it.

Edgecomb also alleges that these pictures depict necrotic sores, and therefore do not accurately depict the body with injuries only caused by the beating. Although her argument here has some merit, our review of the pictures shows that the few sores apparent did not add to the pictures' overall gruesomeness. Undoubtedly these photographs were unpleasant to view, but they lent visual aid to the pathologist's description of what caused Motylewski's death, an issue Edgecomb strongly challenged during cross-examination of the two previous physicians. Because the probative value of the photographs was not outweighed by their tendency to inflame the jury's emotions, the trial court did not err in admitting them.

## VI. Final Jury Instructions

Edgecomb alleges that final jury instructions 2, 11, and 12, constituted error.

 Instructing the jury lies within the sole discretion of the trial court. *Denton v. State,* 496 N.E.2d 576 (Ind.1986). We reverse only when the instructions amount to an abuse of discretion. *Tanner v. State,* 471 N.E.2d 665 (Ind.1984). Jury instructions are to be considered as a whole and in reference to each other; error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case. *Daniel v. State,* 582 N.E.2d 364 (Ind.1991).

 Final Instruction Two stated:

It is up to the jury and only the jury to decide what the accused person actually did or did not do. The lawyers representing each side have presented their evidence and have tried to convince you of their versions of what happened. That is their job. My job is to make sure that the lawyers presented their evidence and arguments in a legally correct way. Also, my job is to explain what laws you need to consider in making your decision, as I am

---

6. Edgecomb also argues that the pictures were not relevant to any issue in the case. Since Edgecomb contested Motylewski's cause of death during her previous cross-examinations of the two physicians who treated Motylewski in the

hospital, clearly evidence supporting the pathologist's testimony that the injuries caused Motylewski's death was relevant. Therefore, we only consider Edgecomb's "more prejudicial than probative" argument.

doing right now. Neither the lawyers nor the judge, however, actually decide what Lawanna Edgecomb, also known as Lawanna King, did or did not do. That is your job and your job alone. Only you can decide what Lawanna Edgecomb, also known as Lawanna King did.

(R. at 659–60.) Edgecomb claims that this instruction unconstitutionally places upon her the burden to prove her innocence.

We agree that this instruction is not the best way to describe a jury's task, which is to decide whether or not the state has proved its case beyond a reasonable doubt. Still, the instruction cannot be fairly characterized as shifting the burden of proof. On that point the court gave Final Instruction Seven: "You should attempt to fit the evidence to the presumption that the defendant is innocent...." (R. at 662.) Moreover, in Final Instruction Eight the court said, in part,

> Under the law of this state, you must presume that the defendant is innocent. You must continue to believe she is innocent throughout the trial unless the State proves that the defendant is guilty beyond a reasonable doubt of every essential element of the crime charged.

(R. at 663.) We conclude that the instructions as a whole adequately informed the jury on the burden of proof.

■ After instructing the jury on the elements of the accomplice liability statute in combination with the murder statute, the trial court further instructed: "If the State failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty. If the State did prove each of these elements beyond a reasonable doubt, you should find the defendant guilty of murder, a felony." (R. at 666.) Edgecomb objects to this instruction, arguing that it should instead read, "If the State failed to prove any of these elements beyond a reasonable doubt, you should find the defendant not guilty." (R. at 609.) Edgecomb argues that the court's instruction suggests to the jury that in order to find the defendant not guilty the State must have failed to prove every element of the offense beyond a reasonable doubt. We disagree. By definition, if the State fails to prove *any* of the elements

beyond a reasonable doubt, it fails to prove *each* of the elements beyond a reasonable doubt.

■ Final Instruction Twelve reads:

> Each juror's verdict must be his/her own and it should not be made out of a need to agree with everyone else. Yet, in order to bring twelve minds to the same decision, jurors have to respect and listen to one another's opinions honestly.
>
> A juror who disagrees with the others, should consider whether the doubt in his mind is a reasonable one, when it makes no impression on so many jurors who are equally honest, who have heard the same evidence, and who are equally sworn to arrive at the truth. You do not have to give up conscientious conclusions, but it is your duty to be absolutely just to the people of the State of Indiana and to Lawanna Edgecomb, also known as Lawanna King.
>
> In summary then, you should remember these two rules when you disagree with the other jurors[:] One, respect and consider the opinions of other jurors; Two, but in the end, reach your own decision.

(R. at 669–70.) Edgecomb objected to this instruction at trial, referring the court to *Siberry v. State*, 133 Ind. 677, 33 N.E. 681 (1893). After taking the matter under advisement, the trial court gave its unedited version of the instruction at trial.

In *Siberry* this Court reversed the judgment of the trial court because of defective jury instructions, one of which instructed the jury that "in a legal sense a reasonable doubt is a doubt which has some reason for its basis.... A reasonable doubt is such a doubt as the jury are able to give a reason for." *Id.* at 686–87, 33 N.E. at 684. This Court found this instruction problematic because it could lead jurors to think that "the defendant should be found guilty unless every juror is able to give an affirmative reason why he has a reasonable doubt of the defendant's guilt.... There is no such burden resting on ... a juror in a criminal case." *Id.* at 690, 33 N.E. at 685.

The instruction in this case did not suffer from the defect identified in *Siberry*. It is a

request that jurors attend to the views of others and re-examine their own. It is an appropriate directive.

## VII. Challenge to the Sentence

The trial court sentenced Edgecomb to sixty years in prison, which encompassed the forty-year presumptive sentence for murder plus the maximum enhancement of twenty years for aggravating circumstances.

The Indiana Constitution gives this Court the power to review and revise criminal sentences. Ind. Const. art. VII, § 4. We currently restrain that power under Indiana Appellate Rule 17(B), limiting appellate revision of sentences authorized by statute to those that are "manifestly unreasonable in light of the nature of the offense and the character of the offender." Ind.Appellate Rule (17)(B)(1); *Fointno v. State,* 487 N.E.2d 140, 145 (Ind.1986). Sentencing decisions are otherwise left to the sound discretion of the trial court. *Hatchett v. State,* 503 N.E.2d 398 (Ind.1987).

In assessing the appropriate sentence, the trial court listed the following aggravating factors: (1) "the defendant was in a position of trust with the victim;" (2) "the victim lost her life;" (3) "the facts of the crime are particularly heinous;" (4) "the victim was of advanced age;" (5) "there was a difference in ages between the victim and the defendant;" (6) "[a]gain, since the defendant was in a position of trust with the victim, the defendant designed to take advantage of the victim's age;" and (7) "the family of the victim recommend[s] an aggravation of the sentence." (R. at 132–33.)

The trial court also noted the following mitigating circumstances: (1) "the defendant has no history of delinquency or criminal activities;" (2) "although, there was evidence of misconduct the defendant had no criminal history;" (3) and "imprisonment of defendant [would] certainly ... result in undue hardship to the persons of the defendant's family and of the defendant's person." (*Id.* at 133.) Although the court recognized these mitigating circumstances, it held that the aggravating circumstances outweighed them and justified the maximum penalty for the crime.

We begin by noting certain problems with some of the aggravating factors listed by the trial court. First, the court erred in listing the fact that "the victim lost her life." Motylewski's homicide is a material element to the felony upon which Edgecomb was convicted, namely murder. A factor constituting a material element of a crime cannot be considered an aggravating circumstance in the enhancement of a sentence. *Green v. State,* 424 N.E.2d 1014 (Ind.1981).

Second, the trial court erred in listing "the defendant was in a position of trust with the victim." Being in a "position of trust" with the victim has certainly been considered a valid aggravating circumstance by Indiana courts in the past. A review of those cases, however, indicates that the relationship between the perpetrator and victim has usually been closer and more involved than that between Edgecomb and Motylewski. For example, in *Wesby v. State,* 535 N.E.2d 133 (Ind.1989), the defendant was convicted of robbing and murdering a woman who had known the defendant since childhood, as she had formerly been the girlfriend of the defendant's father. In *Martin v. State,* 535 N.E.2d 493 (Ind.1989), the defendant was a live-in boyfriend who beat his girlfriend's son to death while babysitting. In *Marshall v. State,* 643 N.E.2d 957 (Ind.Ct. App.1994), the defendant was a police officer who, while engaging in extended counseling of a fourteen-year-old girl with a drug and alcohol problem, sexually molested her during a counseling session.

Edgecomb was not in a "position of trust" with Motylewski as that term is used in these previous cases. Edgecomb was merely a neighbor who occasionally borrowed things from Motylewski's and casually conversed with her when they would see each other. Being a "neighbor" may encompass a higher degree of societal relationship and philial responsibility than that of "stranger" or "acquaintance," but such a relationship, without more, is not a "position of trust" warranting its consideration as an aggravating circumstance. Indeed, Motylewski did not "trust" Edgecomb at all. She told Edgecomb never to visit her again because of Edgecomb's earlier theft of Motylewski's money.

Third, the trial court's finding that "since the defendant was in a position of trust with the victim, the defendant designed to take advantage of the victim's age" as an aggravating factor was also error. Edgecomb was not in a "position of trust", and the victim's advanced age and the disparity between the ages of the victim and defendant were separately listed as aggravating circumstances.

Fourth, the trial court erred in listing "the facts of the crime are particularly heinous" as an aggravating factor without stating what aspects of the crime it found to be heinous. Some factors may, in fact, make this crime "particularly heinous." However, these factors are covered by the "victim's advanced age" and the "disparity between the ages of the victim and the perpetrator" aggravators. If the trial court intended to find facts other than these as suggesting heinousness, it needed to articulate them. As it stands, however, the listing of such a factor, without more, was inappropriate.

Finally, Edgecomb also challenges the trial court's use of the victim's family's recommendation for sentence enhancement as an aggravating factor, arguing that this is inappropriate because it is merely a recommendation for the maximum punishment and not evidence relating to "victim impact." Edgecomb concedes, however, that the trial court is not limited in its considerations to the criteria set forth in Ind.Code Ann. § 35–38–1–7.1(b) (West Supp. 1996). In some cases, the victim alone is affected by a crime. In other cases, such as murder, the victim's loved ones are profoundly and permanently affected by the convicted defendant's deeds. Their opinions, arising from the crime's profound and unalterable affect on their lives and that of the victim's, are acceptable considerations when determining the appropriate sentence. Recommendations from a victim's family for leniency or severity are not mitigating or aggravating circumstances as those terms are used in the sentencing statute. Ind.Code Ann. § 35–38–1–7.1(b)–(c) (West Supp.1996). They may, however, properly assist a court in "determining what sentence to impose for a crime." Ind.Code Ann. § 35–38–1–7.1(a) (West Supp.1996).

In sum, our review indicates that two valid aggravators were considered and articulated by the trial court, namely the victim's advanced age, *see* Ind.Code Ann. § 35–38–1–7.1(a)(4), (b)(5) (West Supp.1996), and the disparity between the victim and the defendant's ages, *Schwass v. State,* 554 N.E.2d 1127, 1130–31 (Ind.1990), along with the victim's family's recommendation for sentence enhancement.

When the aggravating factors are pared down to those legitimately remaining, we conclude that their weight cannot be said to so outweigh the mitigating factors as to justify the maximum sentence. *See, e.g., Tidmore v. State,* 637 N.E.2d 1290, 1294 (Ind.1994) (Sullivan, J., concurring in part, dissenting in part). As the trial court recognized, Edgecomb lacks any prior criminal record, a factor which this Court has previously stated "deserves substantial mitigating weight." *Loveless v. State,* 642 N.E.2d 974, 976 (Ind.1994). As the trial court also recognized, imprisonment would result in undue hardship on Edgecomb's children, Ind.Code Ann § 35–38–1–7.1(c)(10). Finally, we find that the trial court failed to discuss additional mitigating circumstances which have some weight. First, Edgecomb was the person who called 9–1–1 and attempted to help Motylewski after finding her injured. Second, she voluntarily offered incriminating information to the police on many separate occasions. Finally, it was Arion (who also received sixty years for this crime) and Arion alone who entered Motylewski's home under a pretext and repeatedly beat her, causing the injuries which resulted in her death.[7]

When all of the important mitigating factors are weighed against those aggravating factors remaining after we prune from their ranks those erroneously listed, we find that they cancel each other out, rendering a sentence of sixty years manifestly unreasonable.

---

**7.** Although an accomplice may be found guilty of a crime largely executed by her principal, imposition of the same penalty for principal and accomplice may not always be appropriate under the particular circumstances of the case. *Roche v. State,* 596 N.E.2d 896 (Ind.1992).

Accordingly, we remand this cause to the trial court with the instruction that it impose the standard sentence for murder, forty years. In all other respects the trial court is affirmed.

SULLIVAN, SELBY and BOEHM, JJ., concur.

DICKSON, J., concurs as to the conviction but dissents to the revision of the sentence.