Jeff A. LEONE, Appellant
(Plaintiff below),

v.

STATE of Indiana, Appellees
(Defendants below).

No. 28S00–0206–CR–327.

Supreme Court of Indiana.

Oct. 22, 2003.

Susan K. Carpenter, Public Defender of Indiana, David P. Freund, Deputy Public Defender, Office of the Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Scott A. Kreider, Deputy Attorney General, Office of the Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Jeff Leone had been banned from his ex-wife's trailer, but he went in anyway, and discovered her thirteen-year-old daughter inside. He took the daughter to his camper where he killed her, had intercourse with her corpse, and discarded her body on the property behind a shed.

The sentence for this murder was life in prison without parole, based on two statutory aggravating circumstances, torture and intentional killing while attempting or committing child molestation. Leone argues correctly that the evidence does not establish torture, which is something done to a live person. Even without that aggravating circumstance, however, we conclude that the sentence is sustainable.

### Statement of Facts and Procedural History

Jeff Leone and Linda Watkins met in Texas, cohabitated, and later married, in October 1990. Linda's children from a previous marriage (Daniel, Stephanie, and Jennifer) remained with their father in

Texas. Linda and Leone experienced marital problems and separated, and Leone moved to Ellettsville, Indiana. The couple reconciled, and Linda moved to Ellettsville. Linda and Leone secured employment at Indiana University in Bloomington, where Linda worked with computers and Leone worked in security.

During the summer of 1997, Leone's brother Robert and other family members living in Ellettsville noticed that Leone had difficulty with motor skills including driving, speech, and balance. He claimed that he was tired all of the time. A neurologist determined that Leone had suffered multiple strokes.

In 1998, Leone told Linda he wanted a divorce. Leone went to Tennessee for a week, and returned to Ellettsville, but never mentioned the divorce again. The marriage continued to deteriorate thereafter. Leone began to lose interest in all activities except eating, drinking, smoking marijuana, and watching movies. His hygiene also suffered as he stopped taking showers.

Linda's three children moved to Ellettsville after her ex-husband died in 1999. Leone, Linda, and the three children moved to a trailer in Greene County, Indiana. Leone continued to smoke marijuana and listen to music. Linda asked him to stop growing marijuana in their greenhouse, but he refused. Though Linda tried to encourage Leone to do more than sit around the house, his behavior did not change. Linda also discussed Leone's poor hygiene and attempts to have sexual intercourse with her when he was unclean. Leone told Linda that all she was good for was sex and a paycheck. Linda then informed Leone she did not want to have sex with him anymore.

On Thanksgiving Day 2000, Leone told Linda that he wanted a divorce and desired to move into the small camper that was on their property. Linda allowed him to take showers and wash clothes in the trailer home since the camper did not have running water. Early one Saturday morning, Leone entered the trailer, turned the television on and the volume up, and consumed food and drink. Linda became upset, and she told Leone that the trailer was no longer his home and that he was not welcome in it anymore. Leone then removed his belongings from the trailer and gave Linda the keys to the trailer.

On December 8, 2000, Linda took her oldest daughter Stephanie to high school, and then went to work. Her thirteen-year-old daughter Jennifer stayed home due to a cold.

At about 10 a.m., Leone entered the trailer with a key and took a shower. He told Jennifer that he would see her later, but then decided to kill Jennifer to prevent her from telling Linda he had been in the trailer.

Leone returned to the camper and retrieved duct tape. He entered the trailer, grabbed Jennifer from the kitchen table and taped her mouth to keep her from yelling. Leone bound her wrists with the tape and led her towards the camper.

When they arrived at the camper, Jennifer tried to run away from him, but Leone grabbed her and dragged her inside. Leone then threw Jennifer onto a mattress, and ripped her shirt off. When Jennifer asked if he was going to rape her, Leone responded, "Yep." He proceeded to cut Jennifer's clothes with a box cutter.

Leone sat next to Jennifer and smoked marijuana while she lay there nude. He periodically fondled her genital area and breasts and performed oral sex on her. Leone tried to have sexual intercourse with Jennifer but was unable.

Jennifer asked Leone what he was going to do next, but he did not respond. Leone then retrieved a dog choker that was hanging nearby, placed it around Jennifer's neck, pulled on it, and killed her. He had intercourse with Jennifer's corpse. He then dragged her body outside, cut the tape off of her mouth, and taped her ankles and wrists together. He dug a hole and placed Jennifer's body in it with her clothes and buried her. Thereafter, he visited his brother Robert, and they smoked marijuana.

When Stephanie arrived home from school around 3:15 p.m., she called for Jennifer when she entered the trailer, but did not hear a response. Stephanie called her mother at work, and then her grandmother, to ask about Jennifer's whereabouts. She eventually went to Robert Leone's residence across the road to see if Jennifer was there playing with his two sons. She inquired whether Robert saw Jennifer that day, and he said he had not.

Robert Leone, Lillie Paddie, Daniel Watkins, and Leone searched different areas of the eighteen-acre property to look for Jennifer, and Leone never indicated he knew what had happened to her.

Around 6:30 p.m., Detective Chris Lewis and an Indiana State trooper arrived to help search for Jennifer and to look around the trailer. Detective Lewis went to Leone's camper to ask his whereabouts for the day; Leone replied that he had been in the camper all day and had not seen or heard anything. Leone initially said he had not been inside of the trailer since Thanksgiving, but later admitted entering it several times to take showers after everyone left. Leone continued to insist he had not entered the trailer on the day Jennifer stayed at home.

The police left the premises around 4 a.m. Thereafter, Linda, Stephanie, and Daniel tried to sleep in the living room.

The sound of Leone opening the door to the trailer awakened Linda. Leone walked in, dropped the keys on the bar stool next to where she was sitting, picked up the phone, and called someone, whom she later discovered was a 911 dispatcher. Linda heard Leone say, "Come and get me, I did it. I killed her." Leone talked for a couple of minutes and then handed the phone to her. When Linda asked Leone why he killed Jennifer, Leone said because she made him a "sexless man." Linda testified that after she hung up the phone, Leone said that he could show her where Jennifer was buried and that Jennifer "did not suffer". When the police arrived, Leone put his hands out and told them to take him away.

Detective Lewis placed Leone in a car, read him his rights; Leone waived his rights and gave a statement of what happened. Leone then showed where he buried Jennifer's body in a hole behind the shed. Leone expressed his sorrow for his actions. He later told Detective Lewis that since he did not have any more marijuana and since he was going to get caught, he would just turn himself in.

The next day, forensic pathologist Dr. Roland Kohr went to assist with the exhumation of Jennifer's body. He noticed an abrasion around Jennifer's neck that was consistent with a ligature abrasion. He later testified that fresh blood appeared to be coming from Jennifer's vagina, which indicated that she was possibly sexually assaulted.

The autopsy revealed that the duct tape had been placed across Jennifer's mouth while she was still alive. Dr. Kohr observed petechial hemorrhages on Jennifer's face, which are strongly associated with asphyxial deaths where blood flow is cut off by strangulation and causes small capillaries to rupture from the increased

pressure. Kohr also noticed that contusions on the larynx indicated that pressure had been applied to that area, and he believed that the pressure from the dog choker caused the contusions.

Dr. Kohr believed that Jennifer was dead before she had been buried. He opined that Jennifer's heart continued to beat for a short time after she lost consciousness and stopped breathing because he found congestion in her lungs. He said Jennifer was probably conscious for approximately thirteen to fifteen seconds after the ligature interrupted the blood flow to her brain, and he concluded that her death was caused by ligature strangulation. Kohr further found lacerations, contusions, and hemorrhages to the external genital area.

On December 12th, Leone gave a second statement to Detective Lewis in which he complained he had not been sexually involved with Linda for the last two months. He said that when Linda told him that she did not plan to engage in intercourse with him anymore, he began to think about raping and killing Stephanie, Linda' s older daughter. Leone said he killed Jennifer to keep her from telling Linda that he showered in the trailer. He stated that he decided to rape Jennifer after he already decided to kill her. Leone attributed his high sexual appetite to his strokes. His appetite was particularly strong when he smoked marijuana.

Leone eventually pled guilty. The trial court found Leone guilty of felony murder, but mentally ill. It found that Leone intentionally killed Jennifer while committing or attempting to commit child molestation, and he tortured Jennifer while she was still alive.

## I. Was the Evidence of Torture Sufficient?

■ Leone argues that the State failed to prove beyond a reasonable doubt the existence of the aggravating circumstance of torture. While Leone's actions were disgusting, we agree they do not meet the definition of torture.

■ Though Indiana Code § 35–50–2–9(b)(11) does not specifically define "torture"[1], we recently held that torture requires "something more" than the requirements for the usual crime. *Nicholson v. State*, 768 N.E.2d 443 (Ind.2002). It is "an appreciable period of pain or punishment intentionally inflicted and designed either to coerce the victim or for the torturer's sadistic indulgence." *Id.* In essence, "torture is the gratuitous infliction of substantial pain or suffering in excess of that associated with the commission of the charged crime." *Id.* at 447.[2]

The trial court found that Leone "tortured" Jennifer because he bound Jennifer's hands and mouth with duct tape, marched her from the kitchen and forced her into his camper for more than two hours, cut her clothes with a box cutter, attempted to have vaginal intercourse and performed oral sex on her, placed a dog choker around her neck, and used it intentionally to strangle her to death. (Appellant's App. at 628–29.)

1. Ind.Code § 35–50–2–9(b)(11)(C) (West 1998), states that an aggravating circumstance is torture if "[t]he defendant burned, mutilated, or tortured the victim while the victim was alive."

2. Webster's Dictionary defines torture as the "infliction of intense pain to punish or coerce someone; torment or agony induced to penalize religious or political dissent or nonconformity to extort a confession or a money contribution, or to give sadistic pleasure to the torturer." Webster's Third New International Dictionary 2414 (1993).

Although Leone's actions were despicable, they did not exceed the scope of murder or molestation. He did not attempt to coerce Jennifer through torturous acts, nor did he appear to indulge in sadistic acts. In fact, he continuously expressed remorse for his actions, and contacted the police to pick him up. We conclude that the evidence was inadequate to support a finding of torture.

## II. Balancing Mitigating and Aggravating Circumstances

■ Leone contends that the trial court abused its discretion in weighing various mitigating and aggravating circumstances. He says the court gave inadequate weight to several of the circumstances it found as mitigating.

■ We give great deference to a court's determination of the proper weight to assign a circumstance and the appropriateness of the sentence, which is in the trial court's discretion. *Dunlop v. State,* 724 N.E.2d 592, 597 (Ind.2000). We only set aside its decision upon the showing of a manifest abuse of discretion. *Id.* Furthermore, a trial court is not obligated to explain why it finds a circumstance not to be mitigating. *Id.* at 592.

■ The requirement for sentencing findings is more stringent in cases falling under our capital statute than in non-capital cases. The trial court's statement of reasons (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating

circumstances have been evaluated and balanced in determining the sentence, and (iv) must set forth the trial court's own conclusion that the sentence is appropriate punishment for this offender and the crime. *Moore v. State,* 771 N.E.2d 46, 53 (Ind.2002).

■ The trial court here determined that either aggravator outweighed all of the mitigators. (Appellant's App. at 629.) Concerning a contention that Leone had no significant prior record, the court acknowledged Leone's conviction for car theft fifteen years earlier. The court appeared to find lack of record as a mitigator but said it "attaches little significance to this mitigator." *Id.* at 620. Although a lack of a criminal record must be given substantial weight as a mitigator, *Edgecomb v. State,* 673 N.E.2d 1185 (Ind.1996), it is apparent that Leone is not entitled to as much mitigating consideration on this score as someone who had no prior record at all.

Leone contends that because of his stroke, he did not have the capacity to conform his conduct to the law because of mental disease or defect under Indiana Code § 35-50-2-9(c)(6). The court concluded "that defendant suffers from a mental defect due to strokes he suffered in 1997 ... and that the strokes affected his speech and behavior." (Appellant's App. at 623.) The court found that the statutory mitigators did exist but no credible evidence was sufficient to excuse or explain Leone's killing of Jennifer. Finally, the court summarized twelve factors that constituted mitigating circumstances.[3]

---

**3.** The court found the following mitigating factors:

1. Leone had been gainfully employed for most of his adult life until he suffered multiple strokes.

2. Leone was raised in a dysfunctional family and had been physically, emotionally and sexually abused.

3. Leone had a biological propensity towards violence as a male of an alcoholic father.

Of the mitigating circumstances presented, Leone argues that guilty but mentally ill is a significant mitigating circumstance. He cites *Weeks v. State,* 697 N.E.2d 28, 30 (Ind.1998), in which we suggested several factors that support the amount of weight that mental illness should be given in a sentencing decision, such as: 1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment, 2) overall limitations on functioning, 3) the duration of the mental illness, and 4) the extent of any nexus between the disorder or impairment and the commission of the crime.

The record suggests that Leone was generally able to control himself, as there is no indication of previous outbursts of violent behavior toward any of his stepchildren. Although Leone states that he thought about raping Stephanie, he never acted on those thoughts or expressed them to anyone.

Leone tries to explain his actions as a result of depression, which resulted from the stroke. Dr. Haskins suggested that Leone tried self-medicating and repressing his thoughts by smoking excessive amounts of marijuana. Leone urges that his reasons for killing Jennifer were "totally deranged and unbalanced" and "just plain 'crazy' ", and it should thus be a significant mitigating factor. (Appellant Br. at 49–50.)

Leone chose to stay in the camper and smoke marijuana, but there is no indication that he had limited functioning due to the strokes. The strokes occurred in 1997, but no evidence supports that he suffered from mental illness as a result. Nor does a nexus exist between the strokes and his murdering Jennifer. Leone murdered Jennifer because he did not want her to tell Linda he was in the trailer that day. He molested the victim as an afterthought. Though the thought process is irrational, it seems nonetheless unrelated to the stroke.

The trial court's sentencing order is detailed and thoughtful. The court found that each of the charged aggravators outweigh the mitigating circumstances. The valid aggravator—intentional killing while attempting or committing child molestation, appears adequate to outweigh the mitigators, given the nature of the mental illness cited.

### III.  Sentence Review

■ Leone contends that he was sentenced to life without parole under a facially and structurally unconstitutional statutory sentencing scheme, citing *Ring v.*

4.  Leone had a good marriage and was a loving stepfather prior to his strokes in 1997. Also, Leone had never acted inappropriately or abusively toward his stepchildren prior to the offense.

5.  Leone had a history of marijuana abuse and likely was using it to self-treat his mental disorders.

6.  Leone had a learning disability that was never diagnosed nor treated, and it may have predisposed him to impulsive and violent behavior.

7.  Leone suffered multiple strokes in 1997 that led to impairment of his ability to control his impulses.

8.  Leone's personality changed after the strokes including increased libido, but Leone received no medications or treatment which could have alleviated the deficits.

9.  Leone separated from his wife shortly before the murder largely due to changes in his personality following his strokes, and the living conditions in the camper he moved into led to increased stress and depression.

10.  Leone turned himself in shortly after the crime, confessed, and aided in the investigation.

11.  Leone consistently has expressed remorse for his crime and his remorse appears to be genuine.

12.  Leone's behavior in prison has been under control since he was placed on appropriate medication. (Appellant's App. at 623–25.)

*Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[4]

In *Apprendi,* the U.S. Supreme Court held unconstitutional a statute that allowed trial courts to extend the traditional sentencing scheme when they involved hate crimes. *See Apprendi,* 530 U.S. at 468–97, 120 S.Ct. 2348. The Court stated, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. In *Ring,* the Court applied Apprendi to capital cases, holding that the aggravating circumstances had to be determined by a jury. *Ring,* 536 U.S. at 609, 122 S.Ct. 2428. Neither case, however, addresses its application when the defendant issues a guilty plea and waives his right to a jury trial, as the State properly argues. With a plea of guilty, Leone forfeits claimed entitlement to certain rights including the right to a jury trial. *See Id.* at 334–35, 122 S.Ct. 2428; *Mapp v. State,* 770 N.E.2d 332, 334 n. 3 (Ind.2002).

Neither *Apprendi* nor *Ring* suggests that a defendant is not entitled to waive his right to a jury trial. The trial court found that Leone's guilty plea was made freely and voluntarily, and that a factual basis for the plea existed.[5] The trial court, in fact, questioned Leone several times to ensure that he understood his rights and was fully aware that he waived those rights. We conclude that Leone's sentence does not conflict with *Apprendi* or *Ring.*

### Conclusion

We affirm the decision of the trial court.

DICKSON, BOEHM, RUCKER, JJ., concur.

SULLIVAN, J., concurs and dissents with separate opinion.

SULLIVAN, Justice, concurring and dissenting.

I concur in parts I and III of the Court's opinion. I respectfully dissent from part II.

Article VII, § 4, of Indiana Constitution provides that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." To sustain a sentence of life imprisonment without parole, Indiana law requires the weight of the properly proven statutory aggravating circumstances to be greater than the weight of any mitigating circumstances that exist. Ind.Code § 35–

---

4. In *Bostick v. State,* 773 N.E.2d 266, 273 (Ind.2002), we stated:

> The United States Supreme Court, however, has since determined that the Sixth Amendment to the U.S. Constitution requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Ring v. Arizona,* made it clear that *Apprendi* applies to capital sentencing schemes. 536 U.S. at 584, 122 S.Ct. at 2443, 153 L.Ed.2d at 556. Contrary to *Apprendi* and *Ring,* the defendant's sentences to life without parole pursuant to Ind.Code § 35–50–2–9, were based on facts extending the sentence beyond the maximum authorized by the jury's verdict finding [him] guilty of murder.

Here, Leone plead guilty to the murder and waived his rights to a jury trial.

5. The right to trial by jury, a fundamental right guaranteed by the Sixth Amendment of the federal Constitution and by Article 1, § 13 of the Indiana Constitution, is subject to knowing, intelligent, and voluntary waiver. *Woodson v. State,* 501 N.E.2d 409 (Ind.1986). Once the right has been effectively waived, withdrawal of the waiver rests within the discretion of the court. *Id.* at 411.

50–2–9; *Greer v. State,* 749 N.E.2d 545, 549 (Ind.2001). I believe the Court should revise the sentence imposed here because weight of the sole aggravating circumstance does not, in my view, outweigh the combined weight of the mitigating circumstances.

As discussed in the Court's opinion, the trial court's sentence was based on its finding that two statutory aggravating circumstances existed. In part I of the Court's opinion, the Court holds that the trial court's finding of the existence of one of those statutory aggravating circumstances was contrary to law. The sole existing statutory aggravating circumstance, intentional killing while committing child molesting, is without question a very weighty aggravating circumstance. But I believe that its weight is no greater than the combined weight of the mitigating circumstances.

First, Leone pled guilty to the crime charged. A guilty plea demonstrates a defendant's acceptance of responsibility for the crime and at least partially confirms the mitigating evidence regarding his character. *Scheckel v. State,* 655 N.E.2d 506, 511 (Ind.1995). A guilty plea further extends a benefit to the state and the victim or the victim's family by avoiding a full-blown trial. *Id.* Thus, a defendant who pleads guilty deserves to have some mitigating weight extended to the guilty plea in return. *Id. Accord, Widener v. State,* 659 N.E.2d 529, 534 (Ind.1995); *Hardebeck v. State,* 656 N.E.2d 486, 493 (Ind.Ct.App. 1995), *trans. denied. See also Duvall v. State,* 540 N.E.2d 34, 35 (Ind.1989); *Davis v. State,* 477 N.E.2d 889, 899 (Ind.1985) (death penalty case); *Lang v. State,* 461 N.E.2d 1110, 1112–1113 (Ind.1984); *Singer v. State,* 674 N.E.2d 11, 14 (Ind.Ct.App. 1996).

Second, Leone was adjudged by the trial court to be guilty but mentally ill. As best

as I can determine, this is the first case in which we have ever affirmed a sentence of life imprisonment without parole on a person found guilty but mentally ill following a guilty plea. This Court has repeatedly reduced lesser sentences where inadequate weight has been given to the mitigating weight of an adjudication of guilty but mentally ill. *See Crawford v. State,* 770 N.E.2d 775, 783 (Ind.2002) (reduction of defendant's 65 year sentence to the presumptive 55 years in part due to the "significant mitigating circumstance" of defendant's mental illness); *Weeks v. State,* 697 N.E.2d 28, 31 (Ind.1998) (reduction of defendant's 60 year sentence to the presumptive sentence of 50 years due to defendant's mental illness); *Archer v. State,* 689 N.E.2d 678, 685–86 (Ind.1997) (defendant's long-standing mental illness should have been considered as a mitigator and therefore warranted a reduction in defendant's total sentence); *Gambill v. State,* 675 N.E.2d 668, 677–78 (Ind.1996) (defendant's mental illness was a substantial mitigator calling for the imposition of the presumptive sentence); *Mayberry v. State,* 670 N.E.2d 1262, 1271 (Ind.1996) (finding an abuse of discretion where trial court failed to consider defendant's mental illness as a mitigator; remanded for imposition of presumptive sentence); *Barany v. State,* 658 N.E.2d 60, 67 (Ind.1995) (finding a relationship between defendant's mental illness and the commission of the crime; remanded for imposition of presumptive sentence).

Third, as the Court points out, lack of a criminal record must be given substantial weight as a mitigator. *Edgecomb v. State,* 673 N.E.2d 1185 (Ind.1996). The Court finds that this weight should be diminished in Leone's situation for the sole reason that he was convicted of auto theft when he was 24 years old. I would find that a single, non-violent youthful encounter with

the law is insufficient to deprive him of the benefit of the lack of a criminal record mitigating circumstance.

Fourth, the Court sets forth in footnote 3 an additional twelve mitigating circumstances found by the trial court to exist. Several of these relate to the profound negative impact on his personality of the multiple strokes he suffered in 1997. Several others relate explicitly to the mental illness from which he suffers.

I would find that the combined weight of these mitigating circumstances is at least equal to the weight of the sole remaining aggravating circumstance and would reduce Leone's sentence of life imprisonment without parole to one of a term of years.