Krista CLINE, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49S00–9810–CR–594.

Supreme Court of Indiana.

April 19, 2000.

Katherine A. Cornelius, Marion County Public Defenders Agency, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Randi E. Froug, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

RUCKER, Justice

### Case Summary

Krista Cline was charged with the murder of her two-month-old daughter Alexis. At trial Cline sought to shift responsibility for the crime to her boyfriend Lamar Jenkins. The jury returned a verdict of guilty, and the trial court sentenced Cline to sixty-five years imprisonment. In this direct appeal Cline raises four issues for our review which we rephrase as: (1) did the trial court err by excluding evidence of Jenkins' gang affiliation and evidence of his propensity for violence, (2) did the trial court err by allowing into evidence Jenkins' pre-trial hearsay statement, (3) did the trial court err by allowing into evidence the testimony of a counselor that statements made by Cline seemed strange and odd, and (4) did the trial court err by refusing to instruct the jury on the offense of neglect of a dependent.

Finding no reversible error, we affirm.

### Facts

The record shows that when Cline was sixteen years old she became pregnant. As a result, Alexis was born on March 8, 1997. Cline and Alexis lived with Cline's father and stepmother. While Cline attended school half-days, a neighbor babysat Alexis. Cline would return home around noon, retrieve Alexis and stay with her until Cline went to work at a part-time job. During that time, Cline's father and stepmother usually cared for Alexis. On

Friday, May 9, 1997, the neighbor babysat Alexis as usual, and according to the neighbor Alexis seemed healthy that day. Cline, however, had become "frazzled" and was not sure she could cope with raising a child. R. at 483. Although Cline had previously spoken to the neighbor about the possibility of placing Alexis for adoption, Cline became upset when the neighbor suggested that Cline's father and stepmother could obtain custody of Alexis. The following Saturday and Sunday Cline's father and stepmother babysat Alexis. They found her to be healthy and saw nothing unusual about the child.

On Monday, May 12, 1997, Cline decided to stay home from school. She telephoned her boyfriend Lamar Jenkins to let him know that she would be home all day. Jenkins, who is not Alexis' father, came over sometime around 9:30 a.m. or 10:00 a.m. The couple spent the morning smoking marijuana, having sex, and watching television. What happened immediately thereafter is a matter of dispute. Cline testified at trial that while Jenkins was present she took a shower lasting approximately twenty minutes. During that time, according to Cline, Jenkins was alone with Alexis. Cline also testified that when she got out of the shower Alexis was crying loudly and Jenkins then left the house. On the other hand Jenkins acknowledged that the baby was crying just before he left around 2:00 p.m. However he testified that he was in the living room with Cline when that event occurred and the baby was in another room. According to Jenkins, when Cline refused to get the baby, he got her, gave her to Cline, and left shortly thereafter. Jenkins denied that Cline took a shower while he was present. The record shows that Cline's father arrived home around 5:00 p.m. and found Cline lying on the couch with Alexis lying across Cline's chest. According to her father, Cline appeared to have just gotten out of the shower. At her father's suggestion, Cline placed Alexis in her crib. Cline's father then went to the garage. Sometime shortly thereafter Cline saw that Alexis was not breathing, and Cline began screaming. Her father returned from the garage, checked Alexis, and found blood coming from her nose. He called 911. Emergency medical technicians arrived on the scene and transported Alexis to the hospital where she was placed on a life support system. The following day a medical and family decision was made to remove the life support. Alexis died shortly thereafter.

An autopsy revealed that Alexis had suffered numerous injuries all inflicted at approximately the same time. The cause of death was a tear to Alexis' transverse colon due to blunt force impact to the child's abdomen. In addition, there were vaginal and anal injuries that appeared to be caused by a heated object, perhaps a curling iron. Also, there were four areas of blunt force trauma to the child's head.

After giving several statements to the police, Cline was ultimately arrested and charged with murder. While in custody awaiting trial, Cline was held in the Marion County Jail. Two inmates who were also in custody at the jail testified at trial that they overheard a conversation between Cline and her cellmate. According to the inmate witnesses, Cline stated that after Jenkins left the house, she became "stressed out" because she could not get Alexis to stop crying. R. at 782, 804. As a result, she punched Alexis in the stomach. One of the witnesses later spoke with Cline and asked about a report that Alexis had shown signs of injury to her head. According to the witness, Cline demonstrated how that happened indicating that she applied force to Alexis' head using the heel of her hand. A pathologist testified at trial that the blunt force injuries to Alexis' head were consistent with someone using the heel of a hand.

Cline was convicted of murder. This appeal followed. Additional facts are set forth below where relevant.

## Discussion

### I. Gang Affiliation and Prior Bad Acts

Cline's theory of defense at trial was that her boyfriend Jenkins caused Alexis' death. According to Cline, Jenkins inflicted injuries on Alexis during his morning visit when he was alone with the child while Cline took a shower. In an attempt to bolster this theory, Cline sought to introduce evidence that Jenkins was a member of a street gang, and that he had been involved in two physical altercations with other juveniles in the week before Alexis was killed. In response to the State's relevancy objection, the trial court precluded Cline from cross-examining Jenkins on this point and would not allow Cline to introduce a police arrest report concerning Jenkins.

Cline contends the trial court erred in sustaining the State's objection because the evidence was relevant for a number of reasons: (a) to show that Cline was afraid of Jenkins thus explaining why when first questioned by police Cline did not inform them that Jenkins had been present at her home the day Alexis was injured, (b) to show that Jenkins was intelligent enough to commit a violent act thus addressing evidence that Jenkins suffered from a learning disability, (c) to complete the story surrounding the circumstances of the crime, and (d) to show that Jenkins was Alexis' attacker.

■ Although the trial court did not allow Cline to introduce the proffered evidence based on the State's relevancy objection, there is a more fundamental reason supporting the trial court's decision. Under Ind. Evidence Rule 404(b) "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *Spencer v. State*, 703 N.E.2d 1053, 1055 (Ind.1999). In this appeal, Cline advances the above-mentioned reasons to support her claim that evidence of Jenkins' gang membership and violent conduct were admissible. Regardless of the propriety of these claims, at trial Cline's argument in support of admitting the evidence was that "[Jenkins] was in the proximity of the alleged victim, Alexis Cline, on May 12, 1997, the day she allegedly received her fatal injuries ... He had the opportunity and the ability to perform the alleged violent act, to-wit: blunt force trauma, which resulted in her death. Additionally, he had demonstrated the propensity to commit such a violent act." R. at 299–300. Essentially, Cline sought to introduce evidence of Jenkins' prior acts for the sole purpose of demonstrating that because Jenkins had acted violently in the past, he likely acted in conformity with those acts and harmed Alexis. This is the forbidden inference that Ind. Evidence Rule 404(b) specifically proscribes. *Byers v. State*, 709 N.E.2d 1024, 1026–27 (Ind. 1999) ("[R]ule [404(b)] is designed to prevent the jury from making the 'forbidden inference' that prior wrongful conduct suggests present guilt."). The trial court properly excluded evidence of Jenkins' gang affiliation and prior violent conduct. There is no error on this issue.

### II. Evidence of Prior Consistent Statement

■ Cline contends the trial court erred in allowing a police officer to testify concerning the contents of Jenkins' out of court statement. The facts surrounding this contention follow. The State called Jenkins to testify concerning the events of May 12, 1997. Among other things Jenkins testified that on the morning in question he arrived at Cline's house around 9:30 a.m. or 10:00 a.m., he and Cline had sex and smoked marijuana, and he left the house as school was letting out, around 2:00 p.m. R. at 424–50. Jenkins also testified that for most of the time he was in the home the baby was asleep; however just before he left, the baby started crying, and he picked her up and handed her to Cline. R. at 450. Jenkins also testified that Cline did not take a shower while he was present in the home. R. at 553. On cross-examination, Cline challenged Jenkins' veracity

and his ability to correctly remember the events of the day in question. In rebuttal, the State called to the stand Officer Larry Smith who had taken Jenkins' statement on July 15, 1997. Through Officer Smith, the State sought to offer the statement as evidence of a prior consistent statement. Over Cline's hearsay objection, Officer Smith testified that Jenkins told him Cline called Jenkins on the morning of May 12, 1997, and told him to come to the house between 10:30 and 11:00 a.m.; the two smoked marijuana; Alexis awoke one time and was fine while he was in the home; and that he left Cline's house just as school was letting out. R. at 764–75. Cline contends Officer Smith's testimony was not admissible under the prior consistent statement rule because (a) the statement was not consistent and (b) at the time Jenkins made the statement he had a motive to lie.

■ Hearsay is an out of court statement offered to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Under Indiana Evidence Rule 801(d)(1)(B), an out-of-court statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is "consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose...." Ind. Evid. R. 801(d)(1)(B). A ruling on the admissibility of arguably hearsay statements is within the sound discretion of the trial court. *Taylor v. State*, 587 N.E.2d 1293, 1302 (Ind.1992).

■ Although minor discrepancies exist between Jenkins' out-of-court statement and his trial testimony, the statement and testimony nonetheless are essentially the same. A prior statement need not be completely consistent to meet the requirements of 801(d)(1)(B). Rather, the statement only needs to be "sufficiently consistent." *Willoughby v. State*, 660 N.E.2d 570, 579 (Ind.1996). Here, Jenkins's out-of-court statement and trial testimony satisfy the requirements of the rule.

As for the timing of a motive to fabricate, we recently addressed this issue in *Sturgeon v. State*, 719 N.E.2d 1173 (Ind. 1999). In that case, the trial court admitted a prior statement of State's witness Gregory Anderson implicating the defendant in a murder. The statement was offered to rebut the defendant's inference that Anderson's testimony was influenced by favorable treatment from the State. *Id.* at 1177. The defendant objected to the statement arguing that Anderson made it when he had a motive to fabricate. The evidence at trial showed Anderson sold drugs to the victim on the evening of the murder and later assisted the defendant in disposing of the body. *Id.* at 1179. The evidence also showed that before giving his statement, Anderson was informed by the police that he could be charged in connection with the murder. *Id.* We found no error in the admission of the statement. In so doing we noted:

> We acknowledge the possibility of a motive to fabricate on Anderson's part since he knew he could be charged in connection with the murder and since he participated in certain criminal acts surrounding the murder. However, there is no evidence tending to implicate Anderson in Coffman's murder and therefore no evidence that he had a motive to lie about Sturgeon's involvement when questioned. Without concrete evidence to that effect, we cannot conclude the trial court abused its discretion in admitting Anderson's prior consistent statement.

*Id.* at 1180. The facts pointing to Jenkins' motive to fabricate in this case are even less compelling than the facts pointing to Anderson's motive in *Sturgeon*. Here, although Jenkins talked to the police on July 5th as well as on July 15th, nothing in the record shows that he was ever advised that he could or would be charged with Alexis'

murder; nor is there any evidence that Jenkins participated in any criminal acts surrounding the murder.[1] In like fashion, other than Jenkins' presence in Cline's house on the day Alexis was injured there is no evidence tending to implicate Jenkins in her murder. We conclude that the record does not support Cline's contention that Jenkins had a motive to lie when he spoke with Officer Smith. Accordingly, the trial court did not abuse its discretion in admitting Jenkins' prior consistent statement.

### III.   Counselor's Testimony

■ Cline next contends the trial court erred by admitting certain testimony of a police "Crisis Counselor." We agree, but find the error harmless. The facts are these. The State called as a witness Maureen Ward who was employed by the Indianapolis Police Department as a Crisis Counselor and had worked in that capacity for ten years. Ward explained that her duties required her to "respond to any situation where someone would be in crisis; homicide, sex crimes, robberies and that type of thing." R. at 735. On May 12, 1997, Ward arrived at Cline's home in response to a report of a baby that was not breathing. When Ward heard the age of the child, she assumed it was a case of crib death. R. at 737. As paramedics were transporting Alexis to the hospital, Ward drove Cline to the hospital. Ward testified that while in route Cline asserted three different times that "she would never do anything to hurt her baby." R. at 737. After further questioning the following exchanged occurred:

> [Prosecutor]: Okay. Did you have occasion to talk to the police yourself after this encounter with the defendant that night?
>
> [Ward]: I did mention to Detective Jones that I thought her statements were—

[Defense Counsel]: Judge, I'm going to object to what this witness thought about the statements. Drawing conclusions.

[Prosecutor]: Judge, I believe the witness can testify [about] her impression of what was said.

[Court]: I believe the question was, "what did she tell Detective Jones" and she may answer that question.

[Defense Counsel]: Judge, I object based on relevancy along the lines of what her answer was.

[Court]: Objection overruled. You may respond.

[Ward]: I found it odd because I've been on a lot of crib deaths. The parents never say anything about hurting their child because they know they didn't hurt them.

R. at 738–39. The examination continued:

> [Prosecutor]: What did you tell [Detective Jones]?
>
> [Ward]: I told him that I felt it was strange—
>
> [Defense Counsel]: Judge, I object to relevancy.
>
> [Court]: Note your objection and show it overruled You may answer the question.
>
> [Ward]: I told him I felt it was strange that she said that three (3) times in the car. I just thought it was something that he should know.

R. at 739. Cline contends the trial court erred in allowing Ward to testify as to what she thought about Cline's statements. Cline argues that Ward was not an expert witness and thus her opinion was not relevant. The State concedes that Ward was not qualified as an expert witness under Ind. Evidence Rule 702. However, the State argues that Ward was not testifying as an expert, but rather as a "skilled" lay witness and was thus qualified to give her

---

1. Jenkins' possession of marijuana on the morning Alexis was injured is a criminal offense. *See* Ind.Code § 35-48-4-11. However- er, unlike *Sturgeon* where the related criminal act involved disposing of the body, the offense here was unrelated to Alexis' murder.

opinion under the provision of Ind. Evidence Rule 701.[2]

The parties' argument over whether Ward was a lay or expert witness misses the mark. Taken in context the above colloquy shows that Ward was not giving opinion testimony as such. That is to say, she was not asked to give the jury her opinion about the statements Cline made. Rather, Ward was asked about what she told a police officer concerning Cline's statements. The question here is whether Ward's statements given to the police officer were relevant to any issue in this case. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. We conclude that Ward's statement to a police officer did not make more or less probable any issue before the jury. At most, Ward's statements may have had a bearing on the focus of the officer's subsequent investigation. However, the officer did not testify regarding Ward's statement, and the focus of his investigation was not at issue. In sum, Ward's statement was not relevant and its admission into evidence was erroneous.[3]

■ Nonetheless, the admission of irrelevant evidence will result in reversal only if it can be shown that the testimony substantially influenced the jury's verdict. *Woods v. State,* 677 N.E.2d 499, 505 (Ind. 1997). Here, the evidence showed that Cline's two-month-old child died as a result of blunt force injury to the abdomen. Although Cline attempted at trial to blame her boyfriend, two witnesses testified they overheard Cline tell her cellmate that she

became "stressed out" when the child would not stop crying and as a result she punched the child in the stomach. Both witness were inmates with Cline at the Marion County Jail when they overheard the conversation. However, the record does not show that either witness was in any way compensated for or received favorable treatment for her testimony. Essentially, the credibility of the witnesses was not substantially shaken on cross-examination. Further, Cline's father testified that when he arrived home around 5:00 p.m. on May 12, Cline appeared as though she had "just got out of the shower." R. at 392. This testimony contradicts Cline's assertion that she took a shower some three hours or so earlier when Jenkins was present. As a result, Cline's contention that Jenkins was alone with Alexis for twenty minutes during the time she showered was rebutted. In sum, given the other evidence presented at trial, it is unlikely that Ward's inadmissible testimony substantially influenced the jury's verdict. Hence, although the trial court erred in admitting the testimony, the error was harmless.

### IV. Instruction on Neglect of a Dependent

■ Cline last contends the trial court erred by refusing her instruction on the lesser offense of neglect of a dependent. Cline concedes that neglect of a dependent is neither an inherently included nor a factually included lesser offense of murder. *See Wright v. State,* 658 N.E.2d 563 (Ind. 1995) (establishing three part test for determining whether an instruction on a lesser included offense should be given). However, pointing to evidence that she left her child alone with Jenkins thereby put-

---

2. Ind. Evidence Rule 701 provides: "If the witness is not testifying as an expert, the witness's testimony in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."

3. We also note that Ward's testimony that Cline's statements seemed "odd" and "strange" was premised on Ward's assumption that the child had died as a result of "crib death." However, there was no evidence before Ward to support that assumption. The absence of evidence on this point lends further support to our conclusion that Ward's testimony was not relevant.

ting her at substantial risk for serious bodily injury,[4] Cline argues that neglect of a dependent was her defense at trial. As such, the argument continues, she was entitled to have the jury instructed on that theory of defense. *See Clemens v. State,* 610 N.E.2d 236, 241 (Ind.1993) (a defendant is entitled to an instruction on any defense which has some foundation in the evidence).

■ First, we reject Cline's contention that she was entitled to an instruction on neglect of a dependent as a theory of defense. Neglect of a dependent is not a defense to murder. Rather, a defendant may be tried on charges of both murder and neglect of a dependent. *See, e.g., Pendergrass v. State,* 702 N.E.2d 716 (Ind. 1998); *Clemens v. State,* 610 N.E.2d 236 (Ind.1993); *Jones v. State,* 701 N.E.2d 863 (Ind.Ct.App.1998); *Baker v. State,* 569 N.E.2d 369 (Ind.Ct.App.1991). On this ground alone, the trial court properly rejected Cline's tendered instruction.

■ Second, the manner of instructing a jury lies largely within the sound discretion of the trial court, and we review the trial court's decision only for abuse of that discretion. *Edgecomb v. State,* 673 N.E.2d 1185, 1196 (Ind.1996). The test for reviewing the propriety of the trial court's decision to refuse a tendered instruction is: (1) whether the instruction correctly states the law; (2) whether there was evidence in the record to support the giving of the instruction; and (3) whether the substance of the instruction is covered by other instructions given by the court. *Hartman v. State,* 669 N.E.2d 959, 961 (Ind.1996).

■ Our examination of Cline's proposed instruction shows that it fails the first prong of the test. Specifically, the first sentence of the instruction reads: "Included in the charge of murder in this case is the crime of neglect of a dependent." R. at 321. As Cline now concedes neglect of a dependent is not an inherently included lesser offense of murder nor, as charged in this case, is it a factually included lesser offense of murder.[5] Cline's tendered instruction is an incorrect statement of the law. On this additional ground the trial court properly refused to give the instruction.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

---

4. The neglect of a dependent offense is codified at Ind.Code § 35-46-1-4, which provides in part:

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
>> (1) places the dependent in a situation that endangers the dependent's life or health;
>> (2) abandons or cruelly confines the dependent;
>> (3) deprives the dependent of necessary support; or
>> (4) deprives the dependent of education as required by law;
> commits neglect of a dependent, a Class D felony.

5. Cline's argument actually implicates the doctrine of lesser "related" offenses.

> Broadly stated, the "related" offense doctrine holds that *if the evidence demonstrates* the defendant may have committed a lesser offense in the course of acts that led to the greater charge, even if such offense is not inherently included in the greater charge nor in the prosecutor's factual allegations of the means by which the greater crime charged was committed, and if the defendant so requests, the trier of fact should be given the opportunity to consider the "related" lesser offense.

*Mahla v. State,* 496 N.E.2d 568, 573-74 (Ind. 1986) (emphasis in the original). Cline does not make this argument and thus it is waived for review. In any event, although recognized in some jurisdictions, this state has never applied the doctrine of lesser "related" offenses. *See id.* (commenting that the doctrine goes beyond the principles of "inherently" and "factually" included offenses which are well-established by our case law); *see also Wells v. State,* 555 N.E.2d 1366, 1371 (Ind.Ct. App.1990) (finding it unnecessary to decide whether the doctrine of related offenses should be adopted in Indiana).

BOEHM, J., concurs as to Parts I, II, and IV and concurs in result as to Part III with separate opinion.

BOEHM, Justice, concurring.

I concur in Parts I, II, and IV. I concur in result in Part III because I agree the error in admitting Ward's testimony was harmless. It seems to me that in the testimony quoted by the majority Ward did express an opinion, and that, although not directly stated, her opinion was that Cline was guilty of the crime. If Ward is an expert, this opinion is relevant, but inadmissible under Evidence Rule 704(b) because it is an expression of opinion as to guilt. Because Ward's opinion was derived not from "rational inferences" from her "perceptions" but rather from her experience, she was not a lay witness under Evidence Rule 701, and needed to be qualified as an expert. If Ward is not an expert, I agree with the majority that her opinion may be viewed as irrelevant, but is specifically rendered inadmissible by Rule 701 and also by Rule 704(b).