## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Paul J. Podlejski
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

De'Auntaye White,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

December 16, 2015

Court of Appeals Case No.
48A04-1501-CR-24

Appeal from the Madison Circuit Court

The Honorable Thomas Newman, Jr., Judge

Trial Court Cause No.
48C03-1312-MR-2377

**Baker, Judge.**

[1] De'Auntaye White appeals his conviction of Murder,[1] a felony. He argues that the trial court issued misleading jury instructions and that his sentence is inappropriate in light of the nature of the offense and his character. Finding that the jury instructions were not erroneous and that his sentence is not inappropriate, we affirm.

## Facts

[2] On December 15, 2013, Terrence Cotton and Quayshawn Jordan were playing video games at Cotton's house in Anderson. They wanted to smoke marijuana but did not have any. Cotton called White, who was eighteen years old at the time, to obtain some marijuana, and told him that he wanted around seven grams. When White asked Cotton who else was present, Cotton responded that he "was with Bruh." Tr. 476. White agreed to supply the weed.

[3] White, however, did not have seven grams, and so he called his friend, Steve Smith. Smith had the seven grams but did not have a car, so White called Ronnie Frye to ask for a ride. Frye had his Green Blazer. Frye picked up White and Smith, and the trio headed over to the Greater Community Center to complete the transaction. Smith would later testify that he asked White who they were selling to and White responded: "T.C. and that was it." Tr. 877. Then Smith asked who was with Cotton and White responded: Jordan.

---

[1] Ind. Code § 35-42-1-1.

[4] White and Jordan had a strained relationship. Although they were cousins and interacted civilly—White once bailed Jordan out of jail—they had had a falling out roughly a week before the December 15 incident. Although the details are murky, White would later testify that Jordan gave him a gun to hide but then became angry when White did not give it back. According to White, in the days leading up to December 15, Jordan phoned him: "[Jordan] told me he was going to shoot me because of the situation that we were arguing over . . . ." Tr. 1087. The night before the incident, White texted Jordan an expletive-laced message, saying "stop talkin bout me," "im a hitter," "u on[?]," and "letS get it poppin." State's Ex. 81. At trial, White maintained that he had no idea that Jordan would be at the transaction.

[5] Cotton and Jordan arrived at the Community Center first. As they waited in the car, Jordan was on the passenger side with the seat reclined all the way back. Neither Cotton nor Jordan had a gun.

[6] The trio of Frye, White, and Smith arrived shortly after. They remained in their car for a few minutes while Smith prepared a baggie of marijuana. White exited the Blazer with the baggie in one hand and a handgun in his hoodie pocket.

[7] Jordan exited his car at roughly the same time, and the two began approaching each other. White would later testify that when he saw who it was, he felt afraid—he thought he observed a gun. Cotton saw White pull out his gun. Jordan put his hands up and took a step backward, but White fired. Those at

the scene—Cotton, Smith, and Frye—reported hearing between three and four shots; two shots hit Jordan, including one in the abdomen. Jordan did not die immediately: he lingered in pain, and Cotton found him on the ground telling himself, "Don't die." Tr. 495. Cotton rushed him to the hospital, but Jordan did not survive his injuries.

[8] On December 17, 2013, the State charged White with murder. After a jury trial held from November 18, 2014, through November 25, 2014, the jury found White guilty as charged.

[9] The trial court held a sentencing hearing on December 15, 2014. In asking for the maximum sixty-five years, the State presented White's juvenile record. In 2006, an allegation of battery led to an informal adjustment and probation. In 2008, he was alleged to have committed what would be intimidation if committed by an adult. In that same year, he was placed on probation for what would have been conversion if committed by an adult. In 2009, he was alleged in January to have committed what would be receiving stolen property; in March to have committed false information and criminal mischief; and in September to have committed disorderly conduct and to have possessed marijuana. In 2010, he was alleged to have possessed a firearm, but the allegation was dismissed.

[10] Between 2010 and 2013, White was involved in six more juvenile causes, including criminal recklessness, pointing a firearm, carrying a handgun without a license, battery resulting in bodily injury, intimidation, theft (twice), and

possession of marijuana. Although the instant case is his first adult conviction, White has been arrested fourteen times.

[11] The State stressed two incidents in particular. In the first, White was alleged to have had a gun and was found with bullets in his pockets. The second occurred a few months later, when White was alleged to have shot a gun at his brother. Tr. 1326.

[12] The trial court found White's age to be a slight mitigator because of this prior juvenile history. "Aggravating circumstances are that the defendant's prior criminal history and the fact that this incident was a drug related incident and [] also the victim in this case was a family member which doesn't seem to bother the defendant. . . ." Tr. 1333. The trial court sentenced White to sixty-five years. White now appeals.

## Discussion and Decision

[13] White raises two arguments on appeal: (1) that the trial court's instructions regarding White's claim of self-defense were misleading; and (2) that the length of White's sentence is inappropriate. We will address each in turn.

## I. The Jury Instructions

[14] Jury instruction is a matter within the trial court's sound discretion, and we review such decisions for an abuse of that discretion, granting "great deference" to the trial court. *Cline v. State*, 726 N.E.2d 1249, 1256 (Ind. 2000). In reviewing a trial court's decision to give or refuse tendered instructions, we

consider: (1) whether the instruction correctly states the law; (2) whether there was evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given. *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000). Jury instructions are not to be considered in isolation, but as a whole, and with reference to each other. *Maslin v. State*, 718 N.E.2d 1230, 1233 (Ind. Ct. App. 1999). Therefore, the trial court's ruling will not be reversed unless the instructional error is such that the charge to the jury misstates the law or otherwise misleads the jury. *Lewis v. State*, 759 N.E.2d 1077, 1080 (Ind. Ct. App. 2001).

[15] Among the instructions the trial court provided for self-defense is the following language: "Notwithstanding [a person's right to self-defense], a person is not justified in using force if [] he is committing, or is escaping after the commission of a crime." Tr. 1268. The section ends: "There must be an immediate causal connection between the crime and the confrontation." *Id.* at 1269.

[16] White argues that this instruction is incomplete according to our decision in *Smith v. State*, 777 N.E.2d 32 (Ind. Ct. App. 2002). There, a divided panel held that "a defendant who is committing a crime at the time may not be precluded from asserting the defense of self-defense if there is no immediate causal connection between his or her crime and the confrontation which occasioned the use of force." *Id.* at 36. The court found reversible error where the jury instructions failed to explain this nuance. *Id.* at 37. White claims the trial court's instructions in his case were misleading because, while the instructions

do instruct the jury regarding the causal connection, it is only "one sentence that immediately follows a very lengthy instruction on self-defense. . . ." Appellant's Br. 10.

[17] White's argument fails. The *Smith* court specifically limited its decision to the situation where the defendant "tendered such an instruction," and excluded the situations in which "there is no indication that the defendant tendered an instruction explaining this point of law." *Smith*, 777 N.E.2d at 36. Although the record contains a suggestion that White tendered different instructions to the trial court, tr. 1188-94, he admits, "Both the State's and Defense's Proposed Final Instructions that were tendered to the trial court are not contained anywhere in the record provided to appellate counsel." Appellant's Br. 10, n. 8.

[18] Even if we were to assume that a single sentence is insufficient to explain the causal connection requirement, since we do not have White's proposed final instructions, we cannot know whether his proposed instructions better explained this point of law than the trial court's instructions. Therefore, we cannot say the trial court abused its discretion to instruct the jury as it did.

## II. Appropriate Sentence

[19] Indiana Appellate Rule 7(B) provides the following: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The principal role of such review is to attempt to leaven the outliers, but not to achieve a perceived

"correct" sentence. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference. *Id*. at 1222. "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[20] Turning to the instant case, we find no such compelling evidence. As for the nature of White's crime, it was a relatively cold-blooded murder. Witness accounts suggest that Jordan took a step back and had his hands raised when White fired multiple gun shots. Jordan did not have a gun. His death was not instantaneous; he was conscious after the shooting and died at the hospital. The jury accepted the State's theory of the case, that this was not a family quarrel but rather a brutal murder over "drugs and money." Tr. 1213. The texts sent by White the night before the murder—"im a hitter," "u on[?]," and "letS get it poppin," State's Ex. 81—hardly display restraint or regard for his victim. His lack of regard for the victim before the crime parallels his lack of regard for the victim after the crime; when interviewed for the preparation of the pre-sentencing investigation report, White said, of the man he had murdered, "I regret falling prey to him." App. 53. We find no compelling evidence portraying White's crime in a positive light.

[21] Turning to White's character, we find a troubled young man with a lengthy juvenile history. He has been arrested fourteen times and adjudged delinquent on multiple occasions. His history is certainly made worse by his previous involvement with drugs and guns, both of which played a role in this crime. In spite of these repeated encounters with the law, White continued to sell drugs and carry a gun. We cannot characterize this history as consisting of persistent examples of good character.

[22] We remain mindful that, as our Supreme Court has explained, "[s]entencing considerations for youthful offenders—particularly for juveniles—are not coextensive with those for adults." *Brown v. State*, 10 N.E.3d 1, 6 (Ind. 2014). In the context of that case, the Court found an aggregate sentence of 150 years for a sixteen-year-old to be a "denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the [juvenile] convict, he will remain in prison for the rest of his days." *Id.* at 8 (citing *Graham v. Florida*, 560 U.S. 48, 70 (2010)).

[23] A sixty-five-year sentence does not mean such a denial of hope—White will, in all likelihood, outlive his sentence, meaning any self-improvement he accomplishes in prison will not be immaterial. Indeed, in *Brown* itself, our Supreme Court preserved hope for that defendant by reducing his sentence only to eighty years. *Id.*

In sum, neither the nature of White's offense nor his character provide a compelling reason to deem his sentence inappropriate.

The judgment of the trial court is affirmed.

Bailey, J., and Mathias, J., concur.