

I N T H E

# Court of Appeals of Indiana

Scott A. Blattert, Jr.,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Aug 09 2024, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

August 9, 2024

Court of Appeals Case No.
23A-CR-1571

Appeal from the Lawrence Superior Court

The Honorable John M. Plummer, III, Judge

Trial Court Cause No.
47D01-1911-F3-2104

**Opinion by Judge Mathias**
Judges May and Brown concur.

**Mathias, Judge.**

Scott A. Blattert, Jr. appeals his convictions for Level 3 felony aggravated battery, two counts of Level 5 felony domestic battery, Level 6 felony strangulation, Level 6 felony domestic battery, and Class A misdemeanor domestic battery. Blattert raises five issues for our review, which we reorder and restate as the following four issues:

> 1. Whether we should revisit the holding of another panel of our Court, on interlocutory appeal, that Blattert was not entitled to a defense under Indiana's Religious Freedom Restoration Act (RFRA), Ind. Code §§ 34-13-9-0.7 to -11 (2018).

> 2. Whether the trial court erred in the admission of evidence.

> 3. Whether the trial court acted within its discretion when it declined to accept one of Blattert's proffered jury instructions.

> 4. Whether the State presented sufficient evidence to support Blattert's convictions.

We affirm.

## Facts and Procedural History

Blattert and his wife, Cherry, were married in 2001, and, in August 2018, they moved to Springville in Lawrence County. They considered themselves deeply religious. By September 2019, they had nine children and Cherry was pregnant with their tenth child. Cherry homeschooled the children, and she and Blattert

"made it clear" that they expected the children to conform to their religious precepts. Tr. Vol. 5, p. 211.

[4] Blattert and Cherry "believe[d]" in corporal punishment of the children. *Id.* at 214. That often took the form of "hit[ting]" the children with an eight-to-ten inch "glue stick." *Id.* at 97. Blattert in particular had "experimented with wooden rods" on the children but "settled on glue sticks" because they were more "painful" and did not leave "as many marks." Tr. Vol. 4, pp. 106-07. Blattert also hit the children with his hands and with a belt.

[5] In 2019, Blattert's oldest daughters were fifteen-year-old H.B. and fourteen-year-old Au.B. In April of that year, H.B. and Au.B. contacted the Indiana Department of Child Services (DCS) because Blattert's punishments were "getting more violent," and they were "scared." Tr. Vol. 5, p. 100. DCS sent an agent to the Blatterts' home, but, after interviewing the children, the agent simply warned Blattert and Cherry not to let "it happen[] again." Tr. Vol. 4, p. 110. Following the visit from the DCS agent, Blattert accused H.B. and Au.B. of trying to "break up th[e] family," and his punishments became "more violent, . . . longer, and more frequent." *Id.* at 111-12.

[6] In September, Cherry was instructing the children on "the period between Rome to the Reformation" and "about how Jesus Christ is the center of history." Tr. Vol. 5, pp. 243-44. Au.B. "got very upset" and "frustrated," and Au.B. said "that's not really history" and accused Cherry of "just shoving religion into everything." *Id.* at 244-45. Cherry did not appreciate Au.B.'s

comments and complained about them to Blattert when he came home from work.

[7] Blattert was "very angry" and called Au.B. into the living room, had her lean over the couch, and struck her multiple times with the glue stick. Tr. Vol. 4, p. 137. Afterward, Au.B. turned to face Blattert with her arms crossed. Blattert interpreted the gesture to mean that he could not hurt her, and, "if you can't hurt me, you can't do anything to me." Tr. Vol. 6, p. 143. Blattert was "yelling" and upset that Au.B. had an "attitude" with him. Tr. Vol. 4, p. 137; Tr. Vol. 6, p. 171. He then began striking Au.B. with his belt.

[8] H.B., who had been in her bedroom but could see what was happening, grabbed a nearby video camera and began recording the incident. She started recording about ten minutes after Blattert had initially called Au.B. into the living room. She later testified that she began recording the incident because she knew that Blattert "was going to get violent" and that "DCS [was] looking for some actual evidence." Tr. Vol. 4, p. 138.

[9] In the recorded portion of the incident,[1] Blattert struck Au.B. twenty-five times with his belt, although H.B. had observed "a lot more" before she began recording. *Id.* Blattert grabbed Au.B. by the neck, forced her over the couch,

---

[1] The trial court admitted the recording as State's Exhibit 2. That exhibit arrived in our Court as a cracked CD with an exhibit sticker on it. In order to determine if the recording on the exhibit was viewable, our Court's IT professionals had to remove the exhibit sticker. We were then able to preserve a copy of the recording in .mov format. We will keep that copy in our records until this decision is certified should the physical version of the exhibit be unviewable during that time.

and struck her on the back with his elbow. He pushed her face into the cushions of the couch and held her there for approximately five to seven seconds. He then allowed Au.B. to stand, and, as she turned toward him, he punched her in the face. He pushed her back onto the couch and, while holding her down with his left arm, raised his right arm up and then struck her with his right elbow on her back and near the base of her neck. Blattert released Au.B. only to again grab her by the throat. He then threw her to the ground, jumped on top of her, and placed both hands around her neck while pushing down on her.

[10] At that moment, Cherry noticed that H.B. was recording the attack, and H.B. saw Cherry "coming at" her. Tr. Vol. 4, p. 138. H.B. "ducked into [her] room," turned the camera off, "took the [memory] chip out very fast," and "hid" the memory card. *Id.* at 139. H.B. then handed the camera over to Cherry. Meanwhile, Blattert continued to strike Au.B. with his belt. Au.B. sustained multiple visible marks and bruises from the attack.

[11] Blattert and Cherry had removed or hidden phones from the house, but near Halloween H.B. noticed that Cherry had left a cell phone out to charge during the evening. H.B. used the phone to call the DCS hotline. DCS informed Blattert that an agent would be at the home to investigate allegations of abuse on October 31. The night before, Blattert searched H.B.'s bedroom for the camera's missing memory card, but he did not locate it.

[12] On October 31, DCS assessment case worker Jennifer Rutan arrived at the Blatterts' residence along with a state trooper. Rutan initially observed that

Blattert appeared "confident" in meeting with her. Tr. Vol. 5, p. 61. Rutan then met with H.B. and Au.B. privately. During that meeting, H.B. handed Rutan the camera with the memory card installed and played the video from September. Rutan immediately recorded the playback on her state-issued device and presented that video to the state trooper. At that point, Blattert's "mannerisms and attitude changed." *Id.* at 62. The state trooper then took Blattert into custody and Rutan removed all of the children from the home.

[13] The State charged Blattert with numerous offenses.[2] As relevant to this appeal, the State charged him as follows:

- Count 1: Level 3 felony aggravated battery of Au.B.;
- Count 2: Level 6 felony strangulation of Au.B.;
- Count 4: Level 6 felony domestic battery of H.B.;
- Count 5: Class A misdemeanor domestic battery of H.B.;
- Count 6: Level 5 felony domestic battery of Au.B.; and
- Count 8: Level 5 felony domestic battery of his oldest son, A.B.

[14] In September 2020, Blattert filed a notice of intent to invoke RFRA as a defense to the State's charges. The State moved to strike his putative defense, and, after a hearing, the trial court granted the State's motion. On interlocutory appeal, then-Judge Molter, writing for a unanimous panel of our Court, explained that the State had met its burden to show that Blattert was not entitled to a defense under RFRA

---

[2] The State also charged Cherry under a different cause number.

because [precedent] offers the parental privilege as a defense to battery and similar crimes rather than completely banning the practice of corporal punishments. This accommodates religious practices which require reasonable corporal punishment. While it does not accommodate religious practices requiring unreasonable corporal punishment, there is no apparent accommodation of those practices which would still allow the State to achieve its compelling interest in protecting children from physical abuse.

*Blattert v. State*, 190 N.E.3d 417, 423-24 (Ind. Ct. App. 2022) (*Blattert I*). Thus, our Court affirmed the trial court's decision that Blattert was not entitled to assert a defense under RFRA.

[15] At his ensuing jury trial, and prior to the parties' presentation of evidence, Blattert requested the court to instruct the jury on the defense of parental privilege. In particular, Blattert asked the court to instruct the jury that a parent "may inflict transient pain and minor bruising on a child as . . . corporeal [sic] punishment" under that defense. Tr. Vol. 4, p. 25. The trial court declined to instruct the jury as Blattert requested, but the court did agree to give the jury the pattern jury instruction on the defense of parental privilege. Thus, for each allegation, the court instructed the jury as follows:

> It is a defense to the charge . . . that the Defendant was the parent of [the child] and that Defendant's alleged conduct was the use by Defendant upon [the child] of reasonable force which Defendant reasonably believed to be necessary for [the child's] proper control, training, or education.
>
> In determining whether Defendant's conduct was such reasonable discipline, you may consider:

1. whether the Defendant was [the child's] parent;

2. [the child's] age, sex, and physical and mental condition;

3. the influence of [the child's] example upon other children of the same family or group;

4. whether the alleged force was reasonably necessary and appropriate to compel obedience to a proper command to [the child];

5. whether the alleged force was: disproportionate to [the child's] behavior, and/or unnecessarily degrading, and/or likely to cause serious or permanent harm.

In considering these factors, you should balance them against each other, giving each the weight you find was appropriate under the circumstances in determining whether the alleged force was reasonable discipline.

The State has the burden to prove beyond a reasonable doubt that:

a. the force Defendant used was unreasonable.

or

b. Defendant's belief that the force used was necessary to control the child and to prevent misconduct was unreasonable.

> If you find that the State has not proved a. or b. above beyond a reasonable doubt, you may not convict the Defendant . . . .

*E.g.*, Appellant's App. Vol. 4, pp. 10-11.

[16] During the State's case-in-chief, both H.B. and Au.B. testified to the abuse Blattert had inflicted upon them. The State also sought to have a recorded deposition of Dr. William Smock introduced into evidence. Dr. Smock is the medical director for a police officer training institute and specializes in strangulation prevention. Blattert objected to the admission of Dr. Smock's testimony on the ground that his testimony was irrelevant and based on speculation. Blattert alternatively argued that any relevance from Dr. Smock's testimony was substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. The trial court overruled Blattert's objections and admitted Dr. Smock's testimony.

[17] In his recorded testimony, Dr. Smock explained what strangulation means, how strangulation can happen, and the harms that can result from strangulation. He testified that he reviewed H.B.'s September 2019 recording of Blattert's attack on Au.B. as well as relevant medical records and court documents. Dr. Smock then opined that the impact from Blattert's elbow strike to Au.B.'s upper back, near the base of her neck, created a "substantial risk of death," and he had seen "patients that have had that exact same mechanism of injury . . . that have resulted in serious physical injuries, including death." Ex. Vol. 1, p. 113. Dr. Smock further explained that such strikes to that area can

fracture the cervical spine and the vertebral artery, which is "[t]he artery that takes blood to the brain." *Id.* at 114.

[18] Dr. Smock also opined that Blattert "[h]olding [Au.B.] down on the couch," where "she couldn't breathe," placed Au.B. into "positional asphyxia." *Id.* Dr. Smock testified that that was "100 percent risk of death if that pressure [had been] maintained." *Id.* And Dr. Smock noted that, when Blattert placed his hands around Au.B.'s neck, Blattert again created a substantial risk of Au.B.'s death. As Dr. Smock clarified: "[Au.B.] says [afterward] that she doesn't remember something for a period of time [about the incident]. The lack of memory in someone who has experienced asphyxia, strangulation, positional asphyxia, is indicative of there not being enough oxygen getting to the brain." *Id.* at 115.

[19] Also during Dr. Smock's recorded testimony, Blattert's counsel followed up on Dr. Smock's assessment of records he had reviewed by asking Dr. Smock as follows: "And you were aware of [the] children being locked where?" *Id.* at 128. Dr. Smock responded to that question:

> There was testimony that children were locked in closets. There was testimony that . . . tabasco was being poured down their mouths, that the bathroom was locked and they . . . did not have access to the bathroom in order to wash the tabasco out of their mouth.

*Id.* at 129. In the trial court, Blattert moved to strike that response as an "evidentiary harpoon," which the trial court denied. Appellant's App. Vol. 3, p. 173 (citing the relevant part of Dr. Smock's deposition in paragraph 7(o)).

[20] After the State had presented its evidence, Blattert called Cherry as a witness on his behalf. Cherry testified that, although she knew of progressive discipline, that was not the "plan" for discipline in their family. Tr. Vol. 6, p. 22. Rather, the Blatterts' plan was "whatever Scott felt was appropriate at the time." *Id.*

[21] Cherry also testified that Blattert, as "the father" and "the husband, is the head of the home." Tr. Vol. 5, p. 211. The State asked follow-up questions about what that meant on cross-examination:

> Q      Okay. If Scott Blattert, the head of the household, says, this is the way we are doing religious instruction, then that's how it is, right?
>
> A      Yes.
>
> Q      Okay. If Scott Blattert says, Cherry, you are to teach these books and not these books, that's the way it is, right?
>
> A      Yes.
>
> Q      And if Scott Blattert says, Cherry, you are testifying in my case whether it's good for you or not, you're going to testify in [my] case whether it's good for you or not, correct?

Tr. Vol. 6, p. 65. At that point, Blattert's counsel objected. The trial court overruled the objection, and Cherry stated that, "No," she would not testify merely because Blattert had instructed her to do so. *Id.* at 67. And she added that "[h]e did not" instruct her to do so. *Id.* at 68.

[22] Following deliberations, the jury found Blattert guilty of the above-listed offenses. The trial court then sentenced Blattert to an aggregate term of thirteen years, with eighteen months suspended to supervised probation. This appeal ensued.

## 1. We decline to revisit *Blattert I*.

[23] We first address Blattert's request that we revisit our opinion on interlocutory appeal in *Blattert I*. Blattert's request invokes the law-of-the-case doctrine. As our Supreme Court has made clear:

> under the law-of-the-case doctrine[,] a court will not revisit issues already determined in a previous appeal in the same case. This means that an earlier decision governs the case throughout all of its subsequent stages, as to all questions which were presented and decided. In Indiana, absent extraordinary circumstances, we apply this doctrine in its strictest sense.

*Isom v. State*, 170 N.E.3d 623, 658 (Ind. 2021) (quotation marks and citations omitted).

[24] Blattert argues that, now that facts have been fully developed by way of a jury trial, we should reconsider our Court's analysis in *Blattert I*. He also argues that our Court's analysis in *Blattert I* is erroneous. But we are not persuaded by

Blattert's arguments, and we see no reason, let alone an extraordinary one, to revisit *Blattert I*. We reject Blattert's arguments accordingly.

## 2. The trial court did not err in its admission of evidence.

[25] We next turn to Blattert's several challenges to the trial court's evidentiary decisions. The admission or exclusion of evidence rests within the sound discretion of the trial court, and we review those decisions only for an abuse of that discretion. *Russell v. State*, 234 N.E.3d 829, 858 (Ind. 2024). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

### 2.1 Dr. Smock's testimony was relevant evidence and was not speculation.

[26] Blattert first contends that the trial court erred when it admitted Dr. Smock's recorded deposition testimony into evidence because Dr. Smock's testimony was irrelevant and speculative. In particular, Blattert notes that the State's charge of Level 3 felony aggravated battery required the State to show that Au.B.'s *injuries*, not Blattert's *actions*, created a substantial risk of Au.B.'s death. *See* Ind. Code § 35-42-2-1.5 (2019); *see also Alexander v. State*, 13 N.E.3d 917, 922 (Ind. Ct. App. 2014) (holding that the State's evidence that a shooting victim had sustained "a graze wound" and nothing more was insufficient to show an injury that created a substantial risk of death).

[27] Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in

determining the action." Ind. Evidence Rule 401. Dr. Smock repeatedly stated during his deposition that his evaluation of Blattert's September 2019 attack on Au.B. was based not only on the video, which showed Blattert's actions, but also on Au.B.'s ensuing medical and legal statements, which clarified her injuries. According to the totality of that evidence, Dr. Smock concluded that Au.B. in fact could not breathe while Blattert had her in positional asphyxiation and strangled her. Dr. Smock also concluded that Au.B. had demonstrated memory loss from those events, which in turn suggested that she had in fact suffered oxygen loss to her brain during those moments. And he concluded that the impact from the blow on Au.B.'s back could have been fatal.

[28] Accordingly, Dr. Smock's conclusions made a fact of consequence more or less probable. His deposition testimony was therefore relevant evidence. And his testimony was grounded in Au.B.'s own statements as well as the video; as such, it was not mere speculation.

## 2.2 The trial court acted within its discretion when it declined to exclude Dr. Smock's deposition under Evidence Rule 403.

[29] Blattert also contends that Dr. Smock's deposition should have been excluded under Indiana Evidence Rule 403. Under Rule 403, "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Snow v. State*, 77 N.E.3d 173, 179 (Ind. 2017) (quotation marks omitted). As our Supreme Court has made clear:

> "Trial judges are called trial judges for a reason. The reason is that they conduct trials. Admitting or excluding evidence is what they do." *United States v. Hall*, 858 F.3d 254, 288 (4th Cir. 2017) (Wilkinson, J., dissenting). That's why trial judges have discretion in making evidentiary decisions. This discretion means that, in many cases, trial judges have options. They can admit or exclude evidence, and we won't meddle with that decision on appeal. *See Smoote v. State*, 708 N.E.2d 1, 3 (Ind. 1999). There are good reasons for this. "Our instincts are less practiced than those of the trial bench and our sense for the rhythms of a trial less sure." *Hall*, 858 F.3d at 289. And trial courts are far better at weighing evidence and assessing witness credibility. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). In sum, our vantage point—in a "far corner of the upper deck"—does not provide as clear a view. *State v. Keck*, 4 N.E.3d 1180, 1185 (Ind. 2014).

*Id.* at 177. Thus, where a trial court reasonably could decide that evidence either be "admitted or excluded" under Rule 403, we will not "second-guess the trial court's determination." *Id.* at 179.

[30] Blattert's argument here mirrors his argument under relevance. In particular, he asserts that Dr. Smock's testimony "created a real risk of misleading and confusing the jury as to whether it was the injury or the act that must create a substantial risk of death." Appellant's Br. at 27. We discern no such risk. And, in any event, Blattert's argument simply asks us to second-guess the trial court, which we will not do.

### 2.3 No fundamental error occurred, either.

[31] Blattert further argues that, even if Dr. Smock's testimony on the whole was admissible, the trial court should have *sua sponte* struck specific assertions Dr.

Smock made—namely, the assertions relating to Au.B.'s injuries and the risks she faced from them—under the fundamental-error doctrine. We conclude that the trial court had no duty under the fundamental-error doctrine to interject itself into the proceedings on defense counsel's behalf in order to reach conclusions that the court had already rejected. We affirm on this issue.

## 2.4 Dr. Smock's response to a question asked by defense counsel was not an evidentiary harpoon.

[32]  We next address Blattert's argument that Dr. Smock's response to defense counsel's question about "where" the children had been "locked" was an evidentiary harpoon. Ex. Vol. 1, p. 128. "An evidentiary harpoon involves the deliberate use of improper evidence to prejudice the defendant in the eyes of the jury." *Lucio v. State*, 907 N.E.2d 1008, 1010 n.2 (Ind. 2009) (quotation marks omitted). Our case law has recognized two ways in which an evidentiary harpoon may occur. First, "an evidentiary harpoon occurs when *the prosecution* places inadmissible evidence before the jury for the deliberate purpose of prejudicing the jury against the defendant and his defense." *Overstreet v. State*, 877 N.E.2d 144, 154 (Ind. 2007) (emphasis added). Second, an evidentiary harpoon occurs where a government witness uses an "unrelated" question to "inject[] . . . inadmissible evidence . . . deliberately . . . to incite prejudice" against the defendant. *Perez v. State*, 728 N.E.2d 234, 237 (Ind. Ct. App. 2000).

[33]  Neither of those scenarios occurred here. First, the question was not asked by the prosecution but by the defense. Second, Dr. Smock's answer was not "unrelated" to the question asked. Defense counsel vaguely asked "where" the

children had been "locked." Ex. Vol. 1, p. 128. Dr. Smock's answer related to that question. Thus, there is no evidentiary harpoon.

**2.5 The State was entitled to question Cherry about her motivations for testifying.**

Blattert also asserts that the State inappropriately asked a string of hypothetical questions unfounded in the evidence to "insinuate" that Blattert was a controlling husband and that Cherry's testimony may have been less than truthful. Appellant's Br. at 38. Blattert further suggests that the prosecution's questions of Cherry violated the Indiana Rules of Professional Conduct.

We have no qualms with the State's questions of Cherry. She testified on direct examination that Blattert was the head of their household, and on cross-examination the State sought to explore what that meant and how it may have affected her credibility on Blattert's behalf. The State acted within its role as the prosecution, and we affirm the trial court's rejection of Blattert's arguments to the contrary.

## 3. The trial court did not err when it rejected Blattert's proposed instruction on the defense of parental privilege.

We next consider Blattert's argument that the trial court abused its discretion when it rejected his proposed jury instruction on the defense of parental privilege. As our Supreme Court has explained:

> We review a trial court's manner of instructing the jury for an abuse of discretion. *Inman v. State*, 4 N.E.3d 190, 201 (Ind. 2014) (citing *Cline v. State*, 726 N.E.2d 1249, 1256 (Ind. 2000)). To

determine if a trial court abused its discretion, we consider "(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given." *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000) (citing *Wooley v. State*, 716 N.E.2d 919, 926 (Ind. 1999)). Jury instructions are to be considered as a whole. *Ibid.* A trial court acts within its discretion if it denies a request that would likely confuse the jury. *Ludy v. State*, 784 N.E.2d 459, 461-62 (Ind. 2003).

*Owen v. State*, 210 N.E.3d 256, 267-68 (Ind. 2023).

[37] Indiana has several criminal statutes proscribing battery, with enhanced penalties for victims under the age of fourteen. *E.g.*, I.C. § 35-42-2-1(e)(3). Our Supreme Court has recognized that such statutes reflect Indiana's "powerful interest in preventing and deterring the mistreatment of children." *Willis v. State*, 888 N.E.2d 177, 180 (Ind. 2008). At the same time, however, our Supreme Court has also recognized that parents have a fundamental liberty interest "to direct the upbringing and education of children." *Id.* (quotation marks omitted).

[38] To balance those interests, our Supreme Court in *Willis* adopted the Restatement of the Law (Second) Torts, § 147(1) (1965). *Id.* at 182. As our Supreme Court stated:

> the Restatement provides, "A parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his [or her] child as he [or she] reasonably believes to be necessary for [the child's] proper control, training, or education." Restatement of the Law (Second) Torts, § 147(1) (1965). We adopt the Restatement view. Not only is it entirely consistent

with the law in this jurisdiction, but also it provides guidance on the factors that may be considered in determining the reasonableness of punishment. It reads:

> In determining whether force or confinement is reasonable for the control, training, or education of a child, the following factors are to be considered:
>
> (a) whether the actor is a parent;
>
> (b) the age, sex, and physical and mental condition of the child;
>
> (c) the nature of his offense and his apparent motive;
>
> (d) the influence of his example upon other children of the same family or group;
>
> (e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;
>
> (f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause serious or permanent harm.

Restatement, *supra*, § 150. We hasten to add that this list is not exhaustive. There may be other factors unique to a particular case that should be taken into consideration. And obviously, not all of the listed factors may be relevant or applicable in every case. But in either event they should be balanced against each other, giving appropriate weight as the circumstances dictate, in determining whether the force is reasonable.

*Id.* (some alterations original to *Willis*).

[39]     And, applying those factors to the case before it, our Supreme Court explained:

> Several of the factors suggested by the Restatement are helpful in evaluating the facts in this case. Although we know that J.J. is an eleven-year-old male child, there is nothing in the record concerning his physical or mental condition. In any event, "A punishment which would not be too severe for a boy of twelve may be obviously excessive if imposed upon a child of four or five." Restatement, *supra*, § 150 cmt. c. As for the nature of the offense and J.J.'s apparent motive, the record is not clear as to why J.J. took his mother's clothing to school and then lied about it. That aside, most parents would likely consider as serious their eleven-year-old child's behavior in being untruthful and taking property of others. At the very least a parent might consider that such behavior could set the stage for more aberrant behavior later in life. Willis expressed her concerns in this regard, "[H]e's going to do it again. . . . [H]e's already done it again. . . . And I hate to say it, but I know my son will end up back in the court system." Comments to the Restatement provide, "[A] more severe punishment may be imposed for a serious offense, or an intentional one, than for a minor offense, or one resulting from a mere error of judgment or careless inattention. The fact that the child has shown a tendency toward certain types of misconduct may justify a punishment which would be clearly excessive if imposed upon a first offender." Restatement, *supra*, § 150 cmt. c. Clearly J.J. was not a first offender.
>
> Concerning whether the force Willis employed against J.J. was reasonably necessary and appropriate to compel obedience to her insistence that he tell the truth, again the Restatement is instructive. "As in all cases in which the question arises as to whether there has been excessive means of carrying out the privilege [to use force], the actor is not privileged to use a means to compel obedience if a less severe method appears to be likely

to be equally effective." Restatement, *supra*, § 150 cmt. d. The record shows that Willis has used progressive forms of discipline. Typical punishment was to send J.J. to his room, ground him, or withhold privileges such as television, games, and time spent outdoors. According to Willis, after grounding failed the last time J.J. was caught stealing, she decided harsher punishment—swatting with a belt—would be more effective. As Willis explained, "I thought about it over the entire weekend and I even tried to talk to him again. And he continued to lie . . . . I didn't know what else to do."

Considering whether the punishment J.J. received was unnecessarily degrading, dispropo[r]tionate to the offense J.J. committed, or likely to cause J.J. serious or permanent harm, we make the following observations. J.J. received five to seven swats on his buttocks, arm, and thigh for what many parents might reasonably consider a serious offense. We find nothing particularly degrading about this manner of punishment. Nor, in context, is it readily apparent that the punishment was disproportionate to the offense. The question is whether the manner of punishment was "likely to cause [J.J.] serious or permanent harm." Restatement, *supra*, § 150(f). The best answer to this question is J.J.'s own testimony which indicated that the swats hurt "[f]or a minute" but did not hurt the next day when he returned to school. To be sure the bruising was still apparent, but there is no indication that the school nurse provided any medical attention or even suggested that medical attention was necessary. In essence it appears from the record that the bruises were neither serious nor permanent. This fact militates against a conclusion that the punishment was unreasonable. *See State v. Wilder*, 748 A.2d 444, 455 (Me. 2000) (concluding that *to trigger criminal liability the physical harm caused by the parent's use of force as a method of discipline must result in more than transient pain and minor, temporary marks or bruises*); *T.G. v. Dep't of Children & Families*, 927 So. 2d 104, 106 (Fla. Dist. Ct. App. 2006) (Bruises are not necessarily indicative of excessive corporal punishment.).

*Id.* at 183-84 (emphasis added; omissions and most alterations original to *Willis*; citations to the record omitted). Thus, our Supreme Court reversed the defendant-mother's battery conviction. *Id.* at 184.

[40] Seizing on the italicized language above, which our Supreme Court used to summarize the holding of the Supreme Judicial Court of Maine in *Wilder*, Blattert sought to instruct the jury that a parent "may inflict transient pain and minor bruising on a child as . . . corporeal [sic] punishment" under the parental-privilege defense. Tr. Vol. 4, p. 25. Again, the trial court declined to instruct the jury as Blattert requested, but the court did agree to give the jury the pattern jury instruction on the defense, which, in turn, followed the provisions of the Restatement adopted by our Supreme Court in *Willis*.

[41] We conclude that the trial court properly instructed the jury. The trial court's instructions to the jury correctly stated the law of the defense of parental privilege. Blattert's proposed instruction, in contrast, provided a fact-specific assessment of circumstances that *might* be reasonable under Indiana law but also *might not* have been reasonable depending on the totality of the circumstances. And his proposed instruction likewise unduly emphasized outcomes of the alleged abuse/discipline rather than the reasonableness of it. Accordingly, we affirm the trial court's rejection of Blattert's proposed jury instruction.

## 4. The State presented sufficient evidence to support Blattert's convictions.

[42] Last, we turn to Blattert's challenges to the sufficiency of the evidence supporting his convictions. For challenges to the sufficiency of the evidence, we consider only the probative evidence and the reasonable inferences therefrom that support the judgment of the trier of fact. *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021). We will neither reweigh the evidence nor judge witness credibility. *Id.* We will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* And the standard of review for a challenge to the sufficiency of the evidence to rebut an affirmative defense is the same as the standard for any sufficiency claim. *See Willis*, 888 N.E.2d at 182-83.

### 4.1 The State presented sufficient evidence to support Blattert's conviction for Level 3 felony aggravated battery.

[43] To show that Blattert committed Level 3 felony aggravated battery, the State was required to demonstrate, in relevant part, that an injury Blattert inflicted upon Au.B. during the September 2019 attack "create[d] a substantial risk of death." I.C. § 35-42-2-1.5. Blattert's argument here is substantively the same as the argument we addressed in part 2.1 above, namely, that Dr. Smock's testimony was speculation and based only on Blattert's acts, not on Au.B.'s injuries. For the same reasons that we rejected Blattert's argument above, we reject them here. The State presented sufficient evidence to show that the injuries Blattert inflicted upon Au.B. created a substantial risk of death.

**4.2 The State presented sufficient evidence to rebut Blattert's defense.**

[44] Blattert also asserts that his convictions on Counts 4, 5, and 6 must be reversed because the State failed to rebut his defense of parental privilege. In Count 4, the State alleged that Blattert had kicked H.B. in October 2019, which caused her moderate bodily injury, pain, and bruising. In Count 5, the State alleged that Blattert had struck H.B. sometime between October 2018 and April 2019 (before the first DCS visit), which caused her moderate bodily injury and pain. And in Count 6, the State alleged that Blattert had done the same to Au.B. during that same time.

[45] Blattert argued that each of those occasions was nothing more than parental discipline. Thus, to rebut that defense, the State's evidence needed to support the jury's finding that Blattert's purported discipline was unreasonable. *Willis*, 888 N.E.2d at 182. We are satisfied that the evidence most favorable to the fact-finder's conclusions met that showing.

[46] For Count 4, H.B. testified that she had found a turtle in a nearby creek and was trying to have the turtle bite its own reflection in a mirror. For this, Blattert kicked H.B. in the shin hard enough to leave a bruise that was still visible two weeks later. Tr. Vol. 4, p. 118. For Count 5 and Count 6, both daughters testified to Blattert hitting them approximately every other day, on up to 100 separate occasions, sometimes "without a reason." Tr. Vol. 5, p. 100. Blattert would strike his daughters with the glue stick, his hand, or a belt, but his default method was the glue stick, which he had settled on over wooden rods because it hurt more and did not leave as many visible marks. The jury acted within its

discretion when it concluded that Blattert's actions underlying Count 5 and Count 6 were unreasonable, and Blattert's arguments to the contrary on appeal simply seek to have us reweigh the evidence, which we will not do.

## Conclusion

[47] For all of these reasons, we affirm Blattert's convictions.

[48] Affirmed.

May, J., and Brown, J., concur.

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Courtney L. Staton
Deputy Attorney General
Indianapolis, Indiana